No. 23-10850-HH

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

IN RE: ATIF, INC.

DANIEL J. STERMER, as Creditor Trustee,

*Appellant*,

v.

OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPANY, OLD REPUBLIC NATIONAL TITLE HOLDING
COMPANY, OLD REPUBLIC TITLE COMPANIES, INC., and
ATTORNEYS' TITLE FUND SERVICES, LLC,

*Appellees*.

Appeal from the United States District Court
for the Middle District of Florida

D. Ct. No. 2:21-cv-950-JLB
Bankr. No. 2:17-bk-1712-FMD
Adv. Pro. No. 2:18-ap-531-FMD

**APPELLANT'S AMENDED OPENING BRIEF**

JON POLENBERG, ESQ. (FL BAR NO. 653306)
DARREN GOLDMAN, ESQ. (FL BAR NO. 88638)
BECKER & POLIAKOFF, P.A.
1 EAST BROWARD BLVD., STE. 1800
FORT LAUDERDALE, FL 33301
PHONE: (954) 987-7550
FAX: (954) 985-4176
JPOLENBERG@BECKERLAWYERS.COM
DGOLDMAN@BECKERLAWYERS.COM
TFRITZ@BECKERLAWYERS.COM

*Attorneys for Appellant Daniel J. Stermer, as
Creditor Trustee*

## CERTIFICATE OF INTERESTED PERSONS

The appellant, Daniel J. Stermer as Creditor Trustee ("Appellant"), under Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1, discloses the following as a complete list of all persons and entities known to Appellant to have an interest in the outcome of this appeal:

Anderson, Margaret M. (counsel for Appellees)

ATIF, Inc. (Debtor)

Attorneys' Title Fund Services, LLC (Appellee)

Attorneys' Title Insurance Fund (Debtor's Parent)

Badalamenti, The Honorable John Leonard (Middle District of Florida District Court Judge)

Becker & Poliakoff, P.A. (counsel for Appellant)

Delano, The Honorable Caryl E. (Middle District of Florida Chief Bankruptcy Judge)

Fernandez, Lara Roeske (counsel for Appellees)

Fox Swibel Levin & Carroll LLP (counsel for Appellees)

Goldman, Darren (counsel for Appellant)

Goldsmith, John (counsel for Appellees)

Leonard, Rhys P. (counsel for Appellees)

Martin, Ashley K. (counsel for Appellees)

Old Republic International Corporation (ORI) (Parent Company of Appellees)

Old Republic National Title Holding Company (Appellee)

Old Republic National Title Insurance Company (Appellee)

Old Republic Title Companies, Inc. (Appellee)

Polenberg, Jon (counsel for Appellant)

Schultz, Ryan M. (counsel for Appellees)

Stermer, Daniel J., as Creditor Trustee (Appellant)

Tomassi, Marie (counsel for Appellees)

Trenam Law (counsel for Appellees)

Any other persons or entities on Appellees' Certificate of Interested Persons

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes the Court may resolve the issues submitted in this appeal based on the record and the briefs, but also believes oral argument will be helpful to the Court in evaluating the issues presented. Appellant therefore respectfully requests oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT .................................................................i

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES ...................................................................................iv

PREFACE REGARDING RECORD CITATIONS AND DEFINED TERMS ......................... viii

STATEMENT OF JURISDICTION .............................................................................x

STATEMENT OF THE ISSUES AND APPLICABLE STANDARDS OF REVIEW ......................1

STATEMENT OF THE CASE .................................................................................3

    A.    Factual Background ..............................................................4

    B.    Procedural Background ..........................................................9

SUMMARY OF THE ARGUMENT .............................................................................18

    A.    The REV Order and Summary Judgment Decisions Require Reversal. ................................................................18

    B.    The Final Judgment on Successor Liability in ATFS' Favor Suffers from Errors Requiring Reversal. ...........................................22

    C.    The Final Judgment on Alter-Ego Suffers from Errors Requiring Reversal. ...............................................................24

ARGUMENT ..................................................................................................27

  I.    It Was Error to Grant Final Judgment to ORT. ...........................................27

    A.    The Bankruptcy Court Needed to Give Notice that It Was Reconsidering Its *Daubert* Order Regarding Pfeiffer's Opinions. ....................................................................27

    B.    Pfeiffer's Opinions Are Reliable Under Rule 702. ...........................31

    C.    It Was Error to Shift Onto Appellant the Burden to Prove the "Discount for Lack of Marketability" for the Title Plant...................36

    D.    Denying Appellant's Rule 15(b) Motion Was an Abuse of Discretion. .........................................................................39

E.   It Was Error to Grant Appellees' Summary Judgment Motion on the Fraudulent Transfer Claim. ......................................42

1.   Fraudulent Intent Exists. ...............................................43

a.   The Master Agreement Was Concealed. ................................44

b.   The Master Agreement Was Between Insiders. ....................49

c.   The Master Agreement Was Not for Reasonably Equivalent Value...................................................52

2.   "Legitimate Purpose" Cannot Be Determined on Summary Judgment. ......................................................53

II.  Disputed Material Facts Precluded Summary Judgment to ATFS on Successor Liability...........................................................56

A.   Did Debtor and ATFS Have Sufficient Overlapping Assets?.............58

B.   Did ATFS Continue Debtor's Business Operations?.........................59

C.   Did Debtor and ATFS Have Common Ownership? ...........................59

D.   Did Debtor Dissolve? ............................................................60

E.   Did ATFS Assume Debtor's Liabilities? ...........................................61

III. Summary Judgment on Alter-Ego Is Legally and Factually Flawed. .............61

A.   The "Improper Use" Factor Did Not Support Summary Judgment. ......................................................................62

B.   Record Evidence Creates a Material Fact Disputes About Whether Creditors Suffered Harmed by ATFS' Corporate Form. ......................................................................65

CONCLUSION ...............................................................................67

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS...................................69

CERTIFICATE OF SERVICE .............................................................70

## Cases

*ADT LLC v. Security Networks, LLC*, 2016 WL 8943163 (S.D.Fla. June 8, 2016) ................................................................................................60

*Aldar Tobacco Grp., LLC v. American Cigarette Co.*, 2010 WL 11549584 (S.D.Fla. Mar. 4, 2010) ................................................................. 36, 38

*Amjad Munim, M.D., P.A. v. Azar*, 648 So.2d 145 (Fla. 4th DCA 1994) ..............60

*Ass Armor, LLC v. Under Armound, Inc.*, 2016 WL 7156092 (S.D.Fla. Dec. 8, 2016) .......................................................................................30

*Beckley Capital Limited Partnership v. DiGeronimo*, 184 F.3d 52 (1st Cir. 1999) ................................................................................................40

*Borden, Inc. v. Florida East Coast Railway Co.*, 772 F.2d 750 (11th Cir. 1985) ..................................................................................................2

*Centimark Corp. v. A to Z Coatings & Sons, Inc.*, 288 F.App'x 610 (11th Cir. 2008) ...................................................................................... 56, 57

*Coral Windows Bahamas, LTD. v. Pande Pane*, 2013 WL 321584 (S.D.Fla. Jan. 28, 2013) ..........................................................................61

*Cox Enterps., Inc. v. News-Journal Corp.*, 469 F.Supp.2d 1094 (M.D.Fla. 2006) ................................................................................ 36, 37, 38

*Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262 (11th Cir. 1998) ................................................................................................43

*Eckhardt v. United States*, 463 F.App'x 852 (11th Cir. 2012) .................. 42, 51, 56

*F.D.I.C. v. Cameron*, 986 F.Supp.2d 1337 (N.D.Ga. 2013) ...................................40

*FMS, Inc. v. Volvo Construction Equipment North America, Inc*, 2007 WL 844899 (N.D.Ill. Mar. 20, 2007) ........................................................ 28, 29

*Global One Financial, Inc v. Intermed Services, P.A.*, 2015 WL 1737710 (S.D.Fla. Apr. 16, 2015) .......................................................................60

*In re All Sorts of Services of America, Inc.*, 631 B.R. 63 (Bankr. M.D.Fla. 2021) ................................................................................................60

*In re Bal Harbour Quarzo, LLC*, 623 B.R. 903 (Bankr. S.D.Fla. 2020) ................48

*In re Bayou Group, LLC*, 362 B.R. 624 (Bankr. S.D.N.Y. 2007) ...........................47

*In re Bull*, 528 B.R. 473 (M.D.Fla. 2015)...................................................65

*In re Chase & Sanborn Corp.*, 904 F.2d 588 (11th Cir. 1990)...............................38

*In re Comprehensive Power, Inc.*, 578 B.R. 14 (Bankr. D.Mass 2017).................56

*In re Davis*, 138. B.R. 106 (Bankr. M.D.Fla. 1992) ................................................48

*In re Earle*, 307 B.R. 276 (Bankr. S.D.Ala. 2002) ....................................................54

*In re Florida Fund of Coral Gables, Ltd.*, 144 F.App'x 72 (11th Cir. 2005)................................................................................................... 49, 50

*In re Fundamental Long Term Care, Inc.*, 507 B.R. 359 (Bankr. M.D.Fla. 2014)................................................................................................... 62, 66

*In re Global Outreach, S.A.*, 2014 WL 4948184 (Bankr. D.N.J. Oct. 2, 2014)...................................................................................................54

*In re Hood*, 727 F.3d 1360 (11th Cir. 2013).........................................................1, 2

*In re Island One, Inc.*, 2013 WL 652562 (Bankr. M.D.Fla. Feb. 22, 2013)............49

*In re Jennings*, 332 B.R. 465 (Bankr. M.D.Fla. 2005) ..................................... 43, 44

*In re Jie Xiao*, 608 B.R 126 (Bankr. D.Conn. 2019) ...............................................47

*In re Kipnis*, 555 B.R. 877 (Bankr. S.D.Fla. 2016) .................................................40

*In re Levine*, 134 F.3d 1046 (11th Cir. 1998) ..........................................................43

*In re McCarn's Allstate Finance, Inc.*, 326 B.R. 843 (Bankr. M.D.Fla. 2005)...................................................................................................43

*In re Pearlman*, 2013 WL 6153869 (Bankr. M.D.Fla. Nov. 22, 2013)...................62

*In re Salem*, 465 F.3d 767 (7th Cir. 2006)..............................................................30

*In re Sherman*, 67 F.3d 1348 (8th Cir. 1995) ..........................................................43

*In re Sigma-Tech Sales, Inc.*, 570 B.R. 408 (Bankr. S.D.Fla. 2017)......................47

*In re Toy King Distribs., Inc.*, 256 B.R. 1 (Bankr. M.D.Fla. 2000) ................. 43, 44

*In re White*, 559 B.R. 787 (Bankr. N.D.Ga. 2016) .................................................38

*Jamil v. SPI Energy Co., Ltd.*, 713 F.App'x 42 (2d Cir. 2017) ................. 36, 37, 38

v

*Kleinman v. Wright*, 2021 WL 5447110 (S.D.Fla. Nov. 22, 2021) ............ 36, 37, 38

*Laboratory Corp. of Am. v. Professional Recovery Network*, 813 So.2d 266 (Fla. 5th DCA 2002) ................................................................. 57

*Lipsig v. Ramlawi*, 760 So.2d 170 (Fla. 3d DCA 2000) .................................. 65, 67

*Macsenti v. Becker*, 237 F.3d 1223 (10th Cir. 2001) ...................................... 28, 29

*Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001) ........................................... 32

*Murphy v. Blackjet, Inc.*, 2016 WL 3017224 (S.D.Fla. May 26, 2016) ..... 56, 58, 59

*N.W.B. Imports & Exports, Inc. v. Eiras*, 2005 WL 5960920 (M.D.Fla. Mar. 22, 2005) ..................................................................... 30

*Niles v. Owensboro Medical Health System, Inc.*, 2011 WL 3205369 (W.D.Ky. July 27, 2011) .............................................................. 35

*PI Telecom Infrastructure, LLC v. City of Jacksonville, FL*, 104 F.Supp.3d 1321 (M.D.Fla. 2015) ........................................................ 42

*Porras v. United States*, 2022 WL 2073006 (M.D.Fla. June 9, 2022) ................... 30

*Resol. Tr. Corp. v. Artley*, 28 F.3d 1099 (11th Cir. 1994) ................................ 39, 40

*SE Prop. Holdings, LLC v. Judkins*, 2020 WL 4280943 (11th Cir. July 27, 2020) ............................................................................. 48

*SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 1992) ................................ 43, 44

*Simmons v. Southern Power and Equipment, LLC*, 2007 WL 9701638 (N.D.Ga. Jan. 4, 2007) .................................................................. 59

*Tippens v. Celotex Corp.*, 805 F.2d 940 (11th Cir. 1986) ................................ 52, 54

*Triant v. American Medical Systems, Inc.*, 2020 WL 4049844 (D.Ariz. July 20, 2020) ........................................................................ 33, 35

*United Food Group, LLC v. Cargill, Inc.*, 2015 WL 13868984 (C.D.Cal. June 8, 2015) ...................................................................... 28, 29

*Wiand v. Wells Fargo Bank, N.A.*, 86 F.Supp.3d 1316 (M.D.Fla. 2015) ............... 42

*Zurich American Insurance Co. v. Hardin*, 2020 WL 3272636 (M.D.Fla. Mar. 11, 2020) ...................................................................... 62, 63, 65

**Statutes**

12 U.S.C. §1821 .............................................................................. 39, 40

Fla. Stat. §624.408 ................................................................................4

Fla. Stat. §688.001 ..............................................................................45

Fla. Stat. §726.105 ..............................................................................43

Fla. Stat. ch. 631.................................................................................55

**Rules**

Federal Rule of Bankruptcy Procedure 7015........................................39

Federal Rule of Bankruptcy Procedure 7056........................................42

Federal Rule of Civil Procedure 15 ......................................................39

Federal Rule of Evidence 402...............................................................10

Federal Rule of Evidence 701...............................................................10

Federal Rule of Evidence 702..................................... 10, 13, 18, 19, 27, 31, 32, 36

Federal Rule of Evidence 703...............................................................10

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ................................... 45, 47, 51

The Restatement (Second) of Contracts §160 (1979)...................... 45, 47

## PREFACE REGARDING RECORD CITATIONS AND DEFINED TERMS

Record citations are as follows:

> [ECF[district court docket number]:[district court file-stamped page number].]

Appellant uses the following defined terms in this brief:

"Appellant" means Daniel J. Stermer.

"ORT" means Old Republic National Title Insurance Company.

"ORH" means Old Republic National Title Holding Company.

"ORC" means Old Republic Title Companies, Inc.

"ATFS" means Attorneys' Title Fund Services, LLC.

"Appellees" means ORT, ORH, ORC, and ATFS.

"Debtor" means ATIF, Inc.

"Trust" means ATIF Trust.

"OIR" means Florida Office of Insurance Regulation.

"DFS" means Florida Department of Financial Services.

"JVA" means the 2009 Joint Venture Agreement.

"Amended JVA" means the 2011 Amended and Restated Joint Venture Agreement.

"Master Agreement" means the 2015 transaction that is the subject of Appellant's fraudulent transfer claim.

"IP" means intellectual property, including the name "The Fund" transferred from Debtor and the Trust to ORT.

"Title Plant" means the compilation of records used to search and detect defects to title once owned and maintained by Debtor. ATFS now maintains the Title Plant.

"REV Trial" means the February 2021 trial on reasonably equivalent value.

"REV Order" means Findings of Fact, Conclusions of Law, and Memorandum Opinion Regarding Reasonably Equivalent Value.

## STATEMENT OF JURISDICTION

The Court has jurisdiction under 28 U.S.C. §157(b) because bankruptcy courts "may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." The adversary proceeding arises under *In re: ATIF, Inc.*, Bankr. No. 1:17-bk-1712-FMD, brought under title 11, and specifies fraudulent transfer, successor liability, and alter ego claims. It is a "core proceeding" under 28 U.S.C. §157(b)(2).

The district court had jurisdiction under 28 U.S.C. §158(a)(1) because the bankruptcy court disposed of Appellant's claims when it granted Appellees' summary judgment motion [ECF3-355] and entered final judgment [ECF3-357].

This Court has jurisdiction under 28 U.S.C. §158(d)(1) because the district court disposed of Appellant's claims when it affirmed the bankruptcy court. [ECF64.]

This appeal is timely because the district court entered its Order on February 15, 2023 [ECF64] and Appellant filed the notice of appeal within 30 days, on March 14, 2023 [ECF65]; Appellant has complied with Federal Rules of Appellate Procedure 3, 4(a)(1), and 6.

1.     Was it error to (a) reconsider the *Daubert* decision without notice; (b) exclude Appellant's valuation expert opinions under Rule 702 after trial despite denying the *Daubert* motion on the same Rule 702 grounds; and (c) disregard Pfeiffer's qualifications because he did not cite textbooks or treatises in his report?

The Court's review is *de novo*, "examin[ing] independently the factual and legal determination of the bankruptcy court and employ[ing] the same standards of review as the district court." *In re Hood*, 727 F.3d 1360, 1363 (11th Cir. 2013). Excluding expert testimony is reviewed for abuse of discretion. *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1281 (11th Cir. 2015). A court abuses its discretion "when it makes a clear error in judgment or applies an incorrect legal standard." *Id.*

2.     Was it error to shift the burden onto Appellant to prove a discount for lack of marketability for the Title Plant?

The Court's review is *de novo*. *In re Hood*, 727 F.3d at 1363. Whether the bankruptcy court "applied the correct burden of proof is [] a question of law subject to plenary review." *Abbott v. Perez*, 138 S. Ct. 2305, 2326 (2018). Factual findings cannot stand when they arise from the wrong burden of proof. *Id.*

---

[1] Appellant raised additional issues not included in this brief. [ECF65:¶¶ 2-5.] While Appellant maintains the bankruptcy and district courts erred deciding those issues, Appellant chooses not to pursue them.

**3.**    **Was it error to deny the motion to conform the pleadings to the evidence?**

The Court's review is *de novo*. *In re Hood*, 727 F.3d at 1363. The denial of a Rule 15(b) motion is reviewed for abuse of discretion. *Borden, Inc. v. Florida East Coast Railway Co.*, 772 F.2d 750, 758 (11th Cir. 1985).

**4.**    **Was it error to grant summary judgment to ORT on Appellant's actual fraud claim?**

The Court's review is *de novo*. *In re Hood*, 727 F.3d at 1363; *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1203 (11th Cir. 2001).

**5.**    **Was it error to grant summary judgment to ATFS on Appellant's successor liability claim?**

The Court's review is *de novo*. *In re Hood*, 727 F.3d at 1363; *Strickland*, 239 F.3d at 1203.

**6.**    **Was it error to grant summary judgment to ORH, ORC, and ATFS on Appellant's alter ego claim?**

The Court's review is *de novo*. *In re Hood*, 727 F.3d at 1363; *Strickland*, 239 F.3d at 1203.

## STATEMENT OF THE CASE

Appellant sought to recover more than $80,000,000 for creditors, alleging (i) Debtor fraudulently transferred its assets to ORT and (ii) ATFS was Debtor's successor-in-interest and liable to Debtor's creditors. Because ORH and ORC used ATFS as a shell, Appellant also alleged they were liable as an alter-ego. Trial on all issues should have commenced in February 2021.

The parties also filed summary judgment motions. Rather than rule on them, the bankruptcy court bifurcated valuation into the REV Trial. The bankruptcy court also evaluated *Daubert* motions and did not exclude any expert from testifying; it rejected efforts to exclude Appellant's valuation expert, Allen Pfeiffer.

Pfeiffer testified consistent with his written opinions and deposition. After receiving the evidence and testimony, the REV Trial concluded. Then, the bankruptcy court, without notice, reconsidered its *Daubert* ruling and excluded Pfeiffer under Rule 702. The bankruptcy court decided Pfeiffer, a leading bankruptcy valuation expert for the largest valuation firm in the world, offered an unreliable methodology because he did not cite textbooks or treatises. That decision relied on the identical reasons to ones rejected from the *Daubert* motion. Without Pfeiffer, the bankruptcy court determined Appellant presented no valuation evidence and failed to prove the transfers lacked reasonably equivalent value.

The bankruptcy court later granted Appellees' summary judgment motion. The bankruptcy court held Appellant had not met his burden to prove fraudulent intent against ORT, successor liability against ATFS, and alter-ego against ORH and ORC. The bankruptcy court then entered final judgment.

## A. Factual Background

Debtor was once the leading title insurer in Florida. [ECF3-272:4¶13.] Known as "The Fund," Debtor conducted its title insurance business through licensed attorney-agents selling Debtor's title policies. [ECF3-272:2¶5.] But insuring title policies was not Debtor's only business. [ECF3-10:21-22¶59; ECF3-146:52-54¶77; ECF3-272:2¶5.] Debtor also provided other services to its agents [ECF3-10:21-22¶59; ECF3-146:52-54¶77; ECF3-272:2¶5], including the following:

- Training [ECF3-10:21-22¶59; ECF3-146:52-54¶77; ECF3-272:2¶5];

- A Title Plant [ECF3-10:21-22¶59; ECF3-146:52-54¶77; ECF3-272:2¶5]; and

- Assistance with title related issues [ECF3-10:21-22¶59; ECF3-146:52-54¶77; ECF3-272:2¶5].

Florida requires title insurers to satisfy financial conditions to maintain authority to sell insurance. *See generally* Fla. Stat. §624.408. One condition called "surplus" measures the difference between assets and liabilities. *See id.* Debtor's surplus had to exceed 10%. [ECF3-272:4¶16.] Beginning in 2008, Debtor suffered

4

financial challenges threatening to push the surplus below 10%. [ECF3-272:4¶¶14-16.]

On July 1, 2009, Debtor contacted ORH, and they formed the JVA. [ECF3-272:5¶30.] Debtor and ORH were equal members in a new limited liability company—ATFS. [ECF3-272:5¶31.] ATFS performed all Debtor's functions except issuing title insurance. [ECF3-10:21-22¶59; ECF3-146:52-54¶77; ECF3-272:7¶¶54-55.] ORH's subsidiary, ORT, sold title insurance for Debtor. [ECF3-272:5¶32-33; ECF3-10:34¶111.] Debtor's remaining function was to satisfy its creditors, *i.e.*, claims related to title policies. [ECF3-272:6¶36.]

ORH contributed $10,700,000 to ATFS. [ECF3-282:49-53.] Debtor contributed a copy of its Title Plant (which ATFS would maintain), its workforce, and its agent network. [ECF3-272:6¶¶38-39; ECF3-274:7¶142.] Nearly all Debtor's employees became ATFS' employees, performing identical jobs to the ones they performed for Debtor. [ECF3-272:6¶¶38-39.] Debtor's officers also transferred to ATFS performing similar, if not identical, roles. [ECF3-272:6-7¶¶40-53; ECF3-10:29¶84.] ATFS employees remained in Debtor's building, which ATFS leased from Debtor. [ECF3-272:7¶¶58-59.] Debtor also licensed ATFS the name "The Fund." [ECF3-10:38-39¶¶127-28; ECF3-146:4-5¶¶8-9; ECF3-272:7¶56.] The plan was that "to the public it would look like The Fund was still around, even though it was really the joint venture behind it, not [Debtor]." [ECF3-10:38-39¶127.]

5

## Debtor and ORH Amend the JVA

ATFS earned fees for Title Plant related services. [ECF3-272:8¶63.] ATFS also received a percentage from premiums earned for title policies ORT issued. [ECF3-272:7¶60.] But ATFS remained unprofitable. [ECF3-272:8¶67.] ORH kept ATFS afloat through loans and pressured Debtor to contribute additional funds despite OIR's financial restrictions. [ECF3-272:8¶¶68-69; ECF3-10:38-40¶¶127,130.] In June 2011, Debtor transferred its trade names and marks, including the name "The Fund," to the Trust. [ECF3-274:5¶129.]

On October 6, 2011, Debtor, ORH, and ATFS entered into the Amended JVA [ECF3-272:8¶73] which altered ATFS' ownership and their relationship:

- ATFS received a free license to use all trade names and marks, including "The Fund." [ECF3-274:5¶128.]
- There were 2 ownership classes. The Class A units, held by ORH, enjoyed all financial rights—profits—and responsibilities. [ECF3-10:40¶132.] The Class B units, held by Debtor, had governance rights and seats on ATFS' board. [ECF3-10:40¶132.] Debtor could convert its Class B units into Class A units after repaying ½ money lent to ATFS. [ECF3-146:92-94¶126.]

- Beginning July 1, 2014, the Amended JVA auto-renewed for one-year terms unless a member terminated it at least 120 days before renewal. [ECF3-146:94-96¶127.]

- Debtor held a put-option and ORH held a call-option, which enabled ORH to divest Debtor's interest in ATFS. [ECF3-10:90¶272; ECF3-146:94-96¶127.]

- If ORH divested Debtor either because ATFS dissolved or ORH exercised its option, Debtor would receive a current, working copy of the Title Plant. [ECF3-10:25¶71.]

The Amended JVA also altered ATFS' ability to earn income. Rather than receiving its share from premiums paid, ATFS only received reimbursement for its expenses, capped at 50% of the net premiums collected. [ECF3-146:69-70¶97.] ATFS remained unprofitable.

ORH, Debtor, and ATFS also entered into an Amended and Restated Operating Agreement, which granted ORH power to direct ATFS' management to "take any and all reasonable actions that are deemed necessary to reduce costs and increase revenue of [ATFS] without the approval of the Board of Governors of [ATFS]." [ECF3-146:75¶104.] ORH also had "the right to impose additional restrictions on the actions of the management of [ATFS] by communicating to said

management from time to time what actions require advance [ORH] approval."
[ECF3-146:75¶104.] Debtor did not have those rights. [ECF35:100-23.]

## The Master Agreement

By Fall 2015, Debtor's surplus approached zero, causing OIR to refer Debtor
to DFS for receivership. [ECF3-272:9,10¶¶82,90.] ORH opposed receivership
because it could result in DFS dissolving ATFS and selling Debtor's rights to the
Title Plant and other assets, including IP. [ECF3-10:47,50,69¶¶159,165,216.] To
avoid this outcome, Debtor, ORT, ORH, ATFS, and the Trust entered into the Master
Agreement. [ECF26:102-16.]

Under the Master Agreement, ORT reinsured Debtor's title policies.
[ECF26:103,106.] ORT received (i) Debtor's cash and cash equivalents totaling
$30,361,074; (ii) Debtor's headquarters valued at $17,210,000; (iii) Debtor's rights
to the Title Plant; and (iv) IP, including "The Fund." [ECF3-10:65,67-68¶¶198,206-
11; ECF26:104; ECF3-274:5-6¶¶129-30.] Debtor retained $1,500,000 in cash and
any liability associated with non-title insurance claims, primarily liability for closing
protection letters. [ECF26:103-04; ECF3-10:74¶230.] On December 10, 2015, OIR
approved the Master Agreement based on the representations by Appellees – not
Debtor. [ECF3-10:62¶189; ECF3-272:11¶100.]

## ORH Takes over ATFS

In January 2016, ORH exercised its call-option taking Debtor's Class B units. [ECF3-272:11¶104.] ORH gave those units to the Trust, which ceded its rights associated with the Class B units. [ECF3-10:71¶221; ECF3-272:11¶105.] On April 1, 2017, ATFS' employees became ORT's employees. [ECF3-272:11¶108.] The employees continued performing the same duties for ATFS, but were paid by ORT. [ECF3-10:96-97¶¶289-90.] Employees remained in the same building now owned by ORT, but rather than paying rent to Debtor, ATFS paid rent to ORT, which, in turn, reimbursed ATFS for the rent payments. [ECF3-10:68,98¶¶208-10,293-94.]

## Debtor Declares Bankruptcy

On March 2, 2017, Debtor filed the bankruptcy case. [ECF3-10:109¶316.] On October 16, 2018, Appellant filed the adversary proceeding, alleging Debtor fraudulently transferred its assets to ORT, ATFS was the successor-in-interest to Debtor, and ATFS was ORH's and ORC's alter-ego using ATFS as a shell. Appellant filed the Corrected Third Amended Complaint on February 26, 2020. [ECF3-13.]

### B.    Procedural Background

### Allen Pfeiffer

Appellant retained Allen Pfeiffer to opine about value. [ECF3-349:22.] Pfeiffer was the Managing Director and Global Leader of Complex Valuation and

Bankruptcy Litigation at Duff & Phelps, the largest valuation firm in the world.[2] [ECF3-342:107:9-19.] Pfeiffer has also worked at PriceWaterhouse Coopers and Standard & Poors. [ECF3-342:108:15-109:13.] Pfeiffer authored numerous articles, taught continuing education classes, and co-chaired valuation conferences. [ECF3-342:111:10-112:6,112:21-113:9.] Pfeiffer also taught at Yeshiva University and the University of Virginia business school. [ECF3-342:112:9-20.] Pfeiffer opined that the combined value for intangible assets (*i.e.*, IP and Title Plant) transferred to ORT was $80,000,000. [Bankr.ECF301-1:21,80¶¶55,180.[3]] Pfeiffer further opined the Title Plant was worth $30,000,000. [Bankr.ECF301-1:67¶154.]

Appellees moved to exclude Pfeiffer's testimony and opinions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Evidence Rules 402, 701, 702, and 703. [Bankr.ECF301.] First, Appellees attacked Pfeiffer's Title Plant valuation as unreliable and inadmissible because it improperly applied the cost approach without addressing the income or market approaches. [Bankr.ECF301:7-19.] Second, Appellees attacked Pfeiffer's intangible assets valuation. Appellees argued Pfeiffer's theory on the "Option to Reemerge" – Debtor's ability to become

---

[2] Pfeiffer is now a Managing Director and Global Service Leader of Expert Services in Financial Services & Valuation Litigation at Kroll, LLC. *See* www.kroll.com/en/our-team/allen-pfeiffer (last accessed May 19, 2023).

[3] Certain documents were filed under seal and accepted under seal by the district court. [ECF11; ECF12.] Appellant refers to those documents by their bankruptcy court designation.

a title insurer again – was speculative and hypothetical because there was no dispute Debtor could not have raised the necessary capital to exercise the option. [Bankr.ECF301:20-29.] Appellees also challenged Pfeiffer's methodology as unreliable because his guideline company analysis, using a "premium over tangible book value of equity," was speculative and failed to adhere to standards for valuing new businesses. [Bankr.ECF301:29-33.]

Appellant opposed the motion [ECF3-269], detailing why Pfeiffer's methodology was sound regarding both the Title Plant and the intangible assets. Appellant highlighted how Pfeiffer's "premium over tangible book value of equity" multiple and subsequent analyses aligned with leading textbooks and treatises, including Shannon P. Pratt et al.'s *Valuing a Business. The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008). [ECF3-269:8-15.] Appellant also argued Pfeiffer's Option to Reemerge opinion was not speculative because any valuation approach assumes there is a buyer. [ECF3-269:16-21.] And to the extent Appellees suggested there was no buyer, that inquiry involved what discount to apply. [ECF3-269:16-21.]

On February 12, 2021, the bankruptcy court granted in part and denied in part the *Daubert* motion. The bankruptcy court agreed the Option to Reemerge depended on speculation that Debtor could raise sufficient equity, and thus barred Pfeiffer from testifying about the Option to Reemerge. [ECF3-275:2¶¶2-4.] The bankruptcy court

denied the rest, finding the Title Plant and intangible assets valuations were admissible expert testimony. [ECF3-275:2-3¶¶5-8.]

At the REV Trial, Pfeiffer testified consistent with his expert report and the bankruptcy court's ruling. Pfeiffer testified about his background and qualifications, his methodology, his assumptions, his rationales, and his opinions on value. [ECF3-342:105:22-160:15.] Pfeiffer explained what "premium over tangible book value" methodology meant, how he calculated it, and why he chose it as the proper guideline for comparison. [ECF3-342:141:21-147:12.] Pfeiffer also described how and why he chose certain companies to use as comparables. [ECF3-342:137:14-138:25.] After testifying about the methodology, and describing his calculations, Pfeiffer opined that the total intangible asset value was $80,000,000. [ECF3-342:149:16-17.] One intangible asset was the Title Plant, which Pfeiffer valued at $30,000,000. [ECF3-342:158:5-9.] Pfeiffer also explained his calculations, assumptions, and reasonings in concluding the Title Plant value. [ECF3-342:149:18-158:9.]

On cross-examination, ORT attacked Pfeiffer's methodology and credibility. It questioned what textbooks, treatises, or articles Pfeiffer listed and relied on in his report. [ECF3-343:30:17-32:24.] When Pfeiffer sought to explain, as he did at his deposition and in opposition to the *Daubert* motion, that he did not cite to any specific textbook or treatise because every single one would approve his approach

[ECF3-343:30:20-22; Bankr.ECF301-2:167:2-169:13], the bankruptcy court refused to let him, noting that Appellant could address the issue on re-direct [ECF3-343:30:17-32:24.]. On re-direct, when Appellant addressed the issue, ORT objected, arguing that Pfeiffer was not permitted to reference treatises not disclosed in the report. [ECF3-343:73:18-76:7.] The bankruptcy court agreed. *Id.*

Following the REV Trial, the bankruptcy court issued the REV Order. [ECF3-349.] The bankruptcy court recognized that Pfeiffer "has years of experience in the valuation field and appears to have the 'specialized knowledge' that would help the Court 'to understand the evidence or to determine a fact in issue.'" [ECF3-349:27.] The bankruptcy court nevertheless excluded Pfeiffer's testimony under Rule 702(c) because it decided Pfeiffer "did not establish that his testimony 'is the product of reliable principles and methods.'" [ECF3-349:27.] The bankruptcy court took issue with Pfeiffer's failure to refer to textbooks or treatises in his report. [ECF3-349:27-28.]

## The REV Trial and REV Order

On February 16, 2021, the REV Trial began. The bankruptcy court recognized it was employing "a disjointed way of handling an adversary proceeding" but wanted to "go to trial on reasonably equivalent value" because "reasonably equivalent value is really what the case comes down to." [ECF3-273:17:11-14,25:6-16,25:6-16.] Both sides raised reservations [ECF3-273:26:21-27:10], but the bankruptcy court

emphasized it was "really interested in going to trial on the reasonably equivalent value issue," and would "at some point" take additional evidence on other issues. [ECF3-273:25:6-16,27:13-16.]

The REV Trial had 2 phases. First, the bankruptcy court received evidence on what rights Debtor had to the Title Plant. [ECF3-278:5:17-6:1.] Once it decided those rights existed, the bankruptcy court tried the value for all the intangible assets transferred to ORT. [ECF3-278:5:17-6:1.] The valuation involved not only the Title Plant, but also "the trade name 'The Fund,' [Debtor's] workforce, patents, software, technology, know-how, and 'those types of assets [that] are not on the balance sheet.'" [ECF3-349:22.]

The bankruptcy court found the intangible assets had no value, and concluded the tangible assets' value transferred by Debtor to ORT was $47,571,074[4] – reasonably equivalent to the liability assumed by ORT, approximately $45 million to $57.2 million. The bankruptcy court held Appellant failed to establish less than reasonably equivalent value. [ECF3-349:31.]

### The 15(b) Motion to Amend

From inception, Appellant argued the assets fraudulently transferred to ORT included the IP, specifically the name "The Fund." Appellees do not dispute they

---

[4] The parties stipulated to the tangible assets' value. [ECF3-349:20,30; ECF3-7; ECF3-8; ECF3-9.]

received the IP but contend that Appellant cannot include the IP in the reasonably equivalent value analysis because it was the property of, and transferred by, Debtor's parent – the Trust. [ECF3-23:14,35-36; ECF3-194:17,23; ECF3-274:10-11¶148(b).]

Appellant argued that, even if ORT was not a direct transferee, it is a subsequent transferee. [ECF3-205; ECF3-248:10; ECF3-274:9-10¶148(a); ECF3-290:22-23.] The initial transfer from Debtor to the Trust was fraudulent, and given Appellant's and FDIC's[5] strong-arm powers to stand in creditors' shoes, Appellant had a 6-year statute of limitations to challenge the initial transfer. [ECF3-205:20-21; ECF3-248:10; ECF3-274:9-10¶148(a); ECF3-290:22-23.] Appellant put Appellees on notice about this argument throughout the litigation. [ECF3-205:20-21; ECF3-248:10; ECF3-274:9-10¶148(a); ECF3:290:22-23.]

During the REV Trial, Appellant sought to admit evidence regarding Debtor's rights to the IP and how the transfer from Debtor to the Trust was fraudulent. [ECF3-340:111:22-113:21.] Appellees objected, arguing again that Appellant cannot raise a subsequent transferee argument because the complaint does not first seek to recover against the Trust as a mediate transferee. [ECF3-340:113:23-114:8.] Appellant argued the law does not require that allegation, so long as the opposing party received notice and the party seeking to avoid the mediate transfer produces

---

[5] The FDIC is one of Debtor's creditors. *See* Claims Register, Case No. 2:17-bk-01712-FMD.

evidence to establish the mediate transfer was fraudulent. [ECF3-340:114:10-19.] Appellant then moved under Rule 15(b)(1) to amend to conform to the evidence. [ECF3-342:89:22-91:8.] The bankruptcy court directed Appellant to file a written Rule 15(b) motion [ECF3-342:96:12-14,21-23], which he did on February 18, 2021 (trial day 3) [ECF3-316]. Because a witness was already present, the bankruptcy court allowed the testimony but deferred ruling on whether it would consider the evidence. [ECF3-340:114:20-115:14.] The bankruptcy court also barred Appellant from presenting other mediate transfer evidence, instead allowing Appellant to put his argument on the record "in about two minutes" because the issue was "coming down the road anyway," *i.e.*, in a subsequent trial. [ECF3-342:99:7-103:11.]

On December 2, 2021, the bankruptcy court denied the 15(b) Motion as futile. [ECF3-356.] According to the bankruptcy court, the FDIC's extended statute of limitations did not apply to the mediate transfer because the transfer occurred after the FDIC's appointment. [ECF3-356:7-10.] The bankruptcy court also decided that because it found the Master Agreement was not a fraudulent transfer, the mediate transfer issue was irrelevant. [ECF3-356:10-11.]

## Summary Judgment

Appellant moved for partial summary judgment on February 10, 2020 – a year before the REV Trial. [ECF3-11.] Appellant argued ORT was liable for an actual fraudulent transfer and ATFS had successor liability for Debtor's debts under a mere

continuation theory. [ECF3-11.] Appellees responded in opposition on August 28, 2020. [ECF3-194.] On July 31, 2020, Appellees moved for summary judgment. [ECF3-23.] Appellant responded on August 31, 2020. [ECF3-205.]

On November 30, 2020, the bankruptcy court heard argument on the summary judgment motions. [ECF3-262.] Rather than rule on the motions, the bankruptcy court commenced the REV Trial in February 2021. *See generally* Bankr. Dkt. On December 2, 2021, the bankruptcy court denied Appellant's summary judgment motion and granted Appellees' summary judgment motion. [ECF3-355.] The bankruptcy court entered final judgment against Appellant the next day. [ECF3-357.]

## The District Court Appeal

Appellant filed his notice of appeal on December 17, 2021. [ECF1.] On February 15, 2023, the district court affirmed. [ECF64.] Appellant filed his notice of appeal to this Court on March 14, 2023. [ECF65.]

This appeal involves errors against separate, but related, entities: fraudulent transfer alleged against ORT and successor liability alleged against ATFS with alter-ego alleged against ORH and ORC.

## A. The REV Order and Summary Judgment Decisions Require Reversal.

The bankruptcy court decided after the REV Trial concluded to exclude Pfeiffer's expert opinion on value under Rule 702(c), without notice to Appellant that it would revisit its decision to accept Pfeiffer as an expert. The ruling decided Pfeiffer, a global leader for Duff & Phelps, the world's premier bankruptcy valuation firm, did not employ reliable methods to render his opinion.

*First*, the bankruptcy court abused its discretion by excluding Pfeiffer without providing Appellant notice. ORT challenged the methodology Pfeiffer employed pretrial, and the bankruptcy court found Pfeiffer's methods reliable. ORT neither moved to reconsider the *Daubert* order nor objected to the bankruptcy court accepting Pfeiffer's testimony at trial. The bankruptcy court's post-trial decision to abandon its *Daubert* ruling, without notice, prevented Appellant from curing concerns about Pfeiffer's methodology after addressing the issue during the *Daubert* process.

*Second*, the bankruptcy court pinned its decision on the fact that Pfeiffer's methodology did not refer to textbooks or treatises. Not only did the bankruptcy

court previously reject that argument, it also misconstrues the record. In response to the *Daubert* motion, Appellant detailed how Pfeiffer's methodology aligned with accepted valuation standards, was consistent with leading textbooks and treatises, and submitted the treatise excerpts into the record. The bankruptcy court also misplaced its reliance on textbooks and treatises. Nowhere does Rule 702 require an expert cite texts or treatises because *Daubert* applies to all expert testimony, not just scientific testimony; an expert may base his testimony on professional study or personal experience. Pfeiffer is qualified based on his professional study and experience, and his methods are reliable. But even when Pfeiffer attempted to testify how valuation texts and treatises endorse his approach, the bankruptcy court barred that testimony, notwithstanding the fact Appellees opened the door to that testimony during cross-examination.

*Third*, the bankruptcy court decided that Appellant did not present a discount for marketability to the $30,000,000 valuation Pfeiffer presented for the Title Plant. But it was ORT's burden to prove the discount. ORT submitted no evidence to prove there was a discount or what that discount should be. The bankruptcy court shifted ORT's burden to Appellant without any cited authority.

During the REV Trial, Appellant filed a prophylactic 15(b) Motion to amend the complaint to conform to the evidence after ORT objected to evidence establishing the Trust as a mediate transferee. The bankruptcy court denied the

motion as futile and injected 2 errors into that decision. First, the bankruptcy court reasoned the statute of limitations had run, which is inconsistent with the statute's plain meaning. Second, the bankruptcy court reasoned futility because there was no fraudulent transfer, having decided the reasonably equivalent value issue. That reasoning turned on ascribing no value to the IP, but allowing the amendment would have required the bankruptcy court determine the IP's value. The decision is circular.

The bankruptcy court also erred when it granted ORT summary judgment despite disputed material facts. The bankruptcy court previously found Appellant established fraudulent intent and ordered ORT produce privileged communications and documents under the crime-fraud exception. The summary judgment order reversed course and ruled Appellant failed to establish fraudulent intent. The two rulings are irreconcilable.

The bankruptcy court erred in granting Appellees' summary judgment because it found 3 badges of fraud: (1) the Master Agreement transferred substantially all Debtor's assets; (2) Debtor had been sued or threatened with suit before the Master Agreement; and (3) Debtor was insolvent or became insolvent due to the Master Agreement. That was enough.

But there are also 3 other badges present: (1) concealing the Master Agreement; (2) the Master Agreement was between insiders; and (3) the Master Agreement was not for reasonably equivalent value.

*First*, Appellant satisfied the concealment badge. Debtor and ORT agreed to keep the Master Agreement confidential, designated the Master Agreement a trade secret (which it is not), and kept its terms a secret. They concealed it.

*Second*, ORT and Debtor maintained a close relationship, establishing they were insiders. ORT provided Debtor advice about its finances, administered Debtor's claims, and mixed their businesses through ATFS. Debtor's employees managed title policies issued by ORT. All work occurred in the same location. When ORT sought approval for the Master Agreement from Debtor's directors, it asked Debtor to take one for the team. When Debtor needed regulatory approval to enter the Master Agreement, it was ORT who spoke with OIR, not Debtor. These facts do not show the Master Agreement was an arm's-length transaction.

*Third*, the bankruptcy court erred when it entered the REV Order, the third badge, for the reasons summarized above.

It was error for the bankruptcy court to find that concealment, insider status, and reasonably equivalent value were not present because Appellant should receive all inferences in his favor. The 3 badges found by the bankruptcy court together with these 3 other badges establish fraudulent intent.

The bankruptcy court also granted ORT summary judgment because it found Debtor had a legitimate purpose for entering the Master Agreement. But the legitimate purpose doctrine requires factual findings after trial. The bankruptcy court

held no trial, even though the record contains facts calling into question Debtor's intent. ORT explained that it was important to keep Debtor from a receivership to avoid losing the business and intellectual property it had accumulated. Debtor and its board were seeking to do what was in Appellees' interests or the board members' personal interest; not in Debtor's or creditors' interest. Given Debtor was insolvent, stringing Debtor along for Appellees' benefit was not legitimate. The Florida Legislature enacted a comprehensive legislative scheme detailing how troubled title insurers are to resolve financial distress. That would be the legitimate purpose; conduct to avoid state oversight was not.

For the foregoing reasons, the Court should reverse the final judgment and remand the case to the bankruptcy court for a trial on fraudulent transfer.

**B.     The Final Judgment on Successor Liability in ATFS' Favor Suffers from Errors Requiring Reversal.**

The central question for successor liability is whether Debtor has become ATFS to avoid debt; has Debtor and ATFS run their own race, or was it a relay where Debtor passed the baton to ATFS? Answering that question is fact intensive. But when the bankruptcy court granted summary judgment, it failed to account for the various disputed facts in the record. Rather, the bankruptcy court decided that Appellant failed to meet his burden employing a piecemeal analysis that ignored the core question.

One overlooked fact is that ATFS called itself The Fund, which was also

Debtor's name. ATFS disguised itself so it would look like Debtor still existed. Another fact overlooked is that ATFS' corporate headquarters were the same as Debtor's. There is also a material fact in dispute over the assets transferred from Debtor to ATFS; Debtor gave ATFS a copy of the Title Plant, use of Debtor's IP, furniture and equipment, and its workforce. All facts not analyzed by the bankruptcy court.

Appellant showed that ATFS continued Debtor's primary business. The bankruptcy court decided, as a factual matter, that Debtor was a title insurer and ATFS was not. The record established the Trust was a common owner for Debtor and ATFS. The bankruptcy court decided that was not sufficient joint ownership. The record established that Debtor had ceased all operations and is in the process of dissolving through the bankruptcy case. The bankruptcy court again decided that was not enough. The record established that ATFS assumed Debtor's liabilities when it undertook leases for Debtor's branch offices, which it used for its business operations. The bankruptcy court decided that too was not enough.

The bankruptcy court did not evaluate the totality of the circumstances when deciding the successor liability claim. Rather than evaluate whether disputes were material, the bankruptcy court weighed the evidence as if it conducted a trial. The Court should reverse for that error.

## C. The Final Judgment on Alter-Ego Suffers from Errors Requiring Reversal.

The alter-ego decision rendered by the bankruptcy court suffers from similar errors. The bankruptcy court recognized factual issues precluded summary judgment for the dominated-and-controlled alter ego factor. But then the bankruptcy court held that ORH, ORC, and ATFS were entitled to summary judgment on the "improper use" factor because Appellant did not show ATFS was formed for an illegitimate purpose. But alter-ego law does not erase subsequent events leading to alter-ego just because a company is initially legitimate. Deciding that forming ATFS for a legitimate purpose was sufficient to disregard subsequent improper use is reason enough to reverse.

The facts also showed there was a joint account in which Appellees comingled their funds. But the bankruptcy court determined that was not enough evidence. The bankruptcy court should have tried the issues to determine the weight to afford the comingled account when deciding alter-ego.

The evidence also established ATFS failed to calculate its revenues, failed to keep proper cash receipts and disbursement records, and failed to keep accurate tax returns. Appellees neither observed corporate formalities nor functioned as a legitimate business would.

The evidence further showed that ATFS was a shell for ORH and ORC (and, to an extent, ORT): ATFS had no employees; ATFS' lease arrangement lacked

economic substance; and ATFS' revenue were service fees capped at the lesser of its expenses or 15% of fees from services provided capped at $2,000,000 (with any excess going to ORH). ATFS could not be profitable or maintain itself.

Taking these facts into account and construing inferences against ORH, ORC, and ATFS, the bankruptcy court should have decided material issues of fact precluded judgment on the "improper use" factor.

The bankruptcy court further erred because it required Appellant establish the creditors' lack of knowledge about the relationship misled or injured creditors. But Debtor's creditors suffered harm because ATFS is liable to Debtor's creditors as a successor when Appellees left nothing for them. Therefore, knowledge makes no difference.

There is also no requirement that not knowing the relationship existed caused the injury. All that is necessary is that the creditors suffered harm due to the improper corporate use. There is also evidence that Appellees misled creditors about the relationship. Creditors believed Debtor had a 50% ownership interest in ATFS, although after the 2011 JVA, Debtor had no financial interest in ATFS. Appellees stated they intended to blur the lines over ATFS' members.

ORH manipulated ATFS' revenues to ensure it would not be profitable. Following the Master Agreement, the parties revised ATFS' operating agreement so that Debtor had no financial interest in ATFS. ORH also caused Debtor to transfer

its interest in ATFS to the Trust. ORH and ORC pulled all value from ATFS and assured Debtor could not regain its interest in ATFS. The scheme ensured creditors could not recover. Taking all inferences in Appellant's favor, a trial should have decided whether Debtor's creditors suffered injuries from ORH and ORC using ATFS improperly.

The decisions rendered overlooked or weighed evidence as if there was a trial. The Court should reverse summary judgment and remand to the bankruptcy court for trial.

## I.      It Was Error to Grant Final Judgment to ORT.

### A.      The Bankruptcy Court Needed to Give Notice that It Was Reconsidering Its *Daubert* Order Regarding Pfeiffer's Opinions.

Appellees moved to exclude Pfeiffer's opinions under *Daubert*, arguing the opinions were unreliable under Rule 702(c). [Bankr.ECF301:9-19.] The bankruptcy court evaluated the argument and, in pertinent part, rejected it. [ECF3-275:2-3.] The parties then proceeded to trial and Pfeiffer testified about his opinions valuing the intangible assets and the Title Plant consistent with his report and the *Daubert* order. [*Compare* ECF3-342:105:6-224:14 *and* ECF3-343:10:12-85:11 *and* ECF468:3-344:11-204:3 *with* Bankr.ECF301-1 *and* Bankr.ECF301-2.] ORT did not move the bankruptcy court to reconsider its *Daubert* decision. [*See generally* ECF3-340-ECF3-345.] But after the REV Trial, the bankruptcy court excluded Pfeiffer under 702(c). [ECF3-349:27-28.]

When the bankruptcy court reconsidered its *Daubert* decision, it did so without notice to Appellant, cutting off his ability to re-address Pfeiffer's *Daubert* qualifications and depriving Appellant due process for what the bankruptcy court called the central issue to the entire case – reasonably equivalent value. Appellees filed a *Daubert* motion pre-trial, Appellant responded, and after reviewing the briefing, the bankruptcy court denied the motion. Without further objection, ORT therefore consented to Pfeiffer's testimony to the extent it tracked his written report

and deposition – which it did. *See ML Healthcare Services, LLC v. Publix Super Markets, Inc.*, 881 F.3d 1293, 1305 (11th Cir. 2018); *Macsenti v. Becker*, 237 F.3d 1223, 1233 (10th Cir. 2001) ("[A] party may waive the right to object to evidence on *Kumho/Daubert* grounds by failing to make its objection in a timely manner.").

Any authority the bankruptcy court had to *sua sponte* reconsider its *Daubert* ruling expired after the REV Trial ended: "By the time both sides had rested their cases, it was entirely too late for [the] Court to conduct a proper *Daubert* analysis." *FMS, Inc. v. Volvo Construction Equipment North America, Inc*, 2007 WL 844899, at *9 (N.D.Ill. Mar. 20, 2007); *see Macsenti*, 237 F.3d at 1231-32 ("*Daubert* does not mandate an inquiry questioning and challenging the scientific proffer absent a timely request by an objecting party.").

*United Food Group, LLC v. Cargill, Inc.*, 2015 WL 13868984 (C.D.Cal. June 8, 2015), is instructive. In *Cargill*, the expert's report and deposition "clearly informed Defendant of the substance of" the expert's testimony. *Id.* at *3. The defendant nevertheless waited until after evidence closed to raise a Rule 702 challenge. *Id.* The *Cargill* court ruled that, by doing so, "basic errors occurred." *Id.* *"The proponent of the evidence was deprived of the opportunity to offer other supporting proof from [the expert] and from literature." Id.* (emphasis added). The *FMS* court noted that the tactic "smacks of sandbagging." *FMS*, 2007 WL 844899, at *8.

While the situation is different here because it was the bankruptcy court rather than ORT who waited until after trial to raise additional Rule 702 concerns,[6] the rationale behind *Macsenti*, *Cargill*, and *FMS* is just as applicable. Appellant received no opportunity to address the bankruptcy court's concerns. Instead, the bankruptcy court's decision injected surprise because it ***had already denied Appellees' Daubert motion*** premised on Pfeiffer's methodology, qualifications, and reliability. [Bankr.ECF301:4-33; ECF3-269:6-32; ECF3-265.] The bankruptcy court had thus already decided Pfeiffer's methodology was reliable and admissible. [ECF3-275:2-3.] Pfeiffer's testimony at trial was consistent with the opinion provided in his report and at his deposition. [*Compare* ECF3-342:105:6-224:14 *and* ECF3-343:10:12-85:11 *and* ECF3-344:200:11-204:3 *with* Bankr.ECF301-1 *and* Bankr.ECF301-2.] Nothing changed between the bankruptcy court's *Daubert* ruling and the post-trial order excluding the testimony as unreliable that notified Appellant about the bankruptcy court not accepting Pfeiffer's testimony. The bankruptcy court's decision to reconsider its decision without giving notice to Appellant abused its discretion. If the bankruptcy court had given Appellant this necessary notice, he would have presented additional evidence to establish Pfeiffer's credentials and satisfy the bankruptcy court's concerns.

---

[6] Appellant has found no case involving a court *sua sponte* excluding an expert after trial and after ruling that the expert could testify consistent with the written opinion.

The district court rejected this argument because "[c]ourts in this circuit have found there is no need to rule to exclude testimony in advance of a bench trial." [ECF64:2.] In each case cited, the court *reserved ruling* on the expert's admissibility, warning the proponent that the court may exclude the evidence, thus providing the proponent notice that it needed to address the witnesses' *Daubert* qualifications during the trial. *See Porras v. United States*, 2022 WL 2073006, at \*2 (M.D.Fla. June 9, 2022); *Ass Armor, LLC v. Under Armound, Inc.*, 2016 WL 7156092, at \*4 (S.D.Fla. Dec. 8, 2016); *N.W.B. Imports & Exports, Inc. v. Eiras*, 2005 WL 5960920, at \*1 (M.D.Fla. Mar. 22, 2005); *see also In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006).[7]

The bankruptcy court issued no warning and did not reserve ruling on admissibility. To the contrary, the bankruptcy court ruled, "Pfeiffer *[wa]s not precluded from* testifying regarding the value of the Title Plant or the value of Debtor's intangible assets" and "Pfeiffer's opinion of reasonably equivalent value *[wa]s admissible* to the extent it does not rely on the value of the Option to Re-Emerge." [ECF3-275:2-3 (emphasis added).] These were not equivocal statements that could have put Appellant on notice that the bankruptcy court may exclude

---

[7] The district court's reliance on *Salem* is puzzling, since the Seventh Circuit admitted expert testimony. The issue was whether the *Daubert* standard for admissibility applied in bench trials – not whether the court reversed its decision without notice.

Pfeiffer. By reversing course without notice, the bankruptcy court violated Appellant's due process right to notice and an opportunity to respond, and thus, abused its discretion.

The district court also held "no harm no foul" because "alternatively, [the bankruptcy court] gave [Pfeiffer's] testimony little or no weight." [ECF64:13.] But there is no basis to transmogrify the bankruptcy court's decision to exclude Pfeiffer under Rule 702 into a decision to give Pfeiffer's testimony minimal weight. The bankruptcy court could weigh evidence and ***could*** give Pfeiffer's testimony little weight, but ***that did not happen***. Rather, the bankruptcy court excluded Pfeiffer's testimony because it decided Pfeiffer "did not establish that his testimony 'is the product of reliable principles and methods' as required by Evidence Rule 702(c)." [ECF3-349:27.] Neither the district court, Appellees, nor Appellant knows what the bankruptcy court would have done had it considered Pfeiffer's testimony rather than exclude it. That factual determination requires remand for a new trial.

Excluding Pfeiffer's testimony after the REV Trial without notice to Appellant, after finding the testimony was admissible, was an abuse of discretion.

### B.    Pfeiffer's Opinions Are Reliable Under Rule 702.

The bankruptcy court recognized that Pfeiffer "has years of experience in the valuation field and appears to have the 'specialized knowledge' that would help the Court 'to understand the evidence or to determine a fact in issue.'" [ECF3-349:27.]

Despite this finding, the bankruptcy court excluded Pfeiffer's testimony under Rule 702(c) because Pfeiffer failed to refer to textbooks or treatises in his report, and thus his opinions were supposedly *ipse dixit*. [ECF3-349:27-28.] This conclusion is wrong in law and fact.

The bankruptcy court placed too much emphasis on references to textbooks and treatises. Appellees raised this issue in their *Daubert* motion, Appellant addressed it in his opposition, and the bankruptcy court rejected it in its order. *See* Part I.B, *supra*. It was improper for the bankruptcy court to make this an issue after having rejected it.

But even if it were proper, Rule 702 does not require an expert quote texts and treatises. *See* Fed.R.Evid. 702. To the contrary, "[a]lthough *Daubert* applies to all expert testimony, not just 'scientific' testimony, there is no question that an expert may still properly base his testimony on 'professional study or personal experience.'" *Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001). Pfeiffer satisfies this standard. Pfeiffer has taught valuation at both Yeshiva University's and the University of Virginia's business schools. [ECF3-342:112:9-20.] Pfeiffer has also served as Managing Director and Global Leader of the litigation and complex valuation practices at both Duff & Phelps and Kroll. [ECF3-342:107:9-19.] The bankruptcy court itself recognized that Pfeiffer "has years of experience in the valuation field and appears to have the 'specialized knowledge' that would help the

Court 'to understand the evidence or determine a fact in issue.'" [ECF3-349:27.] Its decision to disregard Pfeiffer's experience due to the argument he omitted treatises and textbooks is inexplicable. *See*, *e.g.*, *Triant v. American Medical Systems, Inc.*, 2020 WL 4049844, at *13 (D.Ariz. July 20, 2020).

*Triant* is instructive. There, plaintiff's expert's report "d[id] not contain a list of articles or other publications she relied on in reaching her opinions, even though her report states that she plans to use '[e]xcerpts from medical articles and learned treatises' to support her opinions." *Id.* at *13. That court still "conclude[d] that [the expert] is qualified by training and experience to render her opinions." *Id.* So too here. The district court attempted to distinguish *Triant* because Pfeiffer has never separately valued a title plant. [ECF64:14-15.] This misses the point and discounts Pfeiffer's credentials. First, the treatise/textbook issue applied to Pfeiffer's intangible assets valuation – not the Title Plant. [ECF3-349:27-28.] Second, even if the issue did apply to the Title Plant valuation, it should not matter. Pfeiffer is a global leader in "complex valuations" and has years of experience "in the valuation field" – not in any specific asset type valuation. [ECF3-349:27.] This is the exact expertise that gives him the ability to value a unique asset like the Title Plant. Pfeiffer's opinion also valued the "intangible assets" as a whole – not just the Title Plant. While he did assign a value to the Title Plant,[8] he also explained that the

---

[8] Because the textbook/treatise issue only arose with Pfeiffer's opinion for the

intangible assets had a combined "significant value because of the fact that they are combined" and that, for value, "[o]ne plus one is three and not two." [ECF3-344:202:16-18,203:3.] Therefore, Pfeiffer had the experience to value the complex "intangible assets."

The bankruptcy court was also wrong as a factual matter. Pfeiffer *did* rely on and cite to textbooks and treatises. The bankruptcy court's statement that Pfeiffer testified that he "do[es]n't rely on textbooks, I rely on doing valuations the way I always do it" [ECF3-349:27 (quoting ECF3-343:32:3-4)] lacks the associated context. Pfeiffer testified about how he performed his valuation after establishing that he is the leading expert in the valuation for matters in bankruptcy. [ECF3-342:106:15-121:17.] And on 2 separate occasions, Pfeiffer tried to explain that he did not refer to any specific text or treatise because *every* valuation text or treatise endorses his approach. [ECF3-343:30:20-22 ("I did not speak to one textbook. In my view, as I told you in my deposition, every single textbook, every single treatise would say that you take the--"); ECF3-343:73:16-19 ("Every textbook that I'm aware of, from Dr. Damodaran to Mr. Pratt").] The bankruptcy court struck this

_____

intangible assets' value, the bankruptcy court abused its discretion when it excluded both the intangible asset opinion and Title Plant opinion by (incorrectly) holding Pfeiffer did not cite to textbooks or treatises, reasoning his intangible asset opinion was unreliable. *See Sorrels*, 796 F.3d at 1281 ("Where a portion of the proffered expert testimony is reliable, wholesale exclusion can constitute an abuse of discretion.").

testimony because the references were not listed in his report. [ECF3-343:30:23-31:3,73:23-77:2.] But they were discussed in his deposition. [ECF3-343:76:18-22; Bankr.ECF301-2:167:2-169:13.] Courts throughout the country recognize that so long as texts and treatises are "referred to or disclosed in [an] expert report *or deposition testimony*," an expert may testify about them at trial. *Niles v. Owensboro Medical Health System, Inc.*, 2011 WL 3205369, at *1 (W.D.Ky. July 27, 2011) (emphasis added); *see also Triant*, 2020 WL 4049844, at *5. If the bankruptcy court had allowed Pfeiffer to testify, it would have recognized that Pfeiffer did, in fact, have treatise and textbook support.

The bankruptcy court further supported its decision by reasoning that Pfeiffer's methodology was *ipse dixit* – again because he did not refer to specific texts and treatises. [ECF3-349:27-28.] The bankruptcy court misapplied the *ipse dixit* doctrine.[9] *Ipse dixit* means a situation where an expert makes an opinion unconnected to existing data and thus has no facts to support that opinion. *In re J.C. Householder Land Trust #1*, 501 B.R. 441, 454 & n.51 (Bankr. M.D.Fla. 2013). The doctrine does not apply for an expert who ties his opinion to data and facts. The methodology Pfeiffer employed tied the analysis to identifiable and explainable data.

---

[9] The district court did not analyze this issue except to say that it "finds no reversible error in the bankruptcy court describing Mr. Pfeiffer's opinion as *ipse dixit*" even though "other triers of fact might have 'weighed the evidence differently.'" [ECF64:17-18.]

[ECF3-342:105:22-160:15.] It was not *ipse dixit*.

The bankruptcy court's rationale for finding Pfeiffer's valuations opinions unreliable under Rule 702 are contrary to the law and the facts. The bankruptcy court thus abused its discretion when it excluded Pfeiffer's testimony.

## C. It Was Error to Shift Onto Appellant the Burden to Prove the "Discount for Lack of Marketability" for the Title Plant.

It is common for certain assets to have value but not be fully marketable. *See, e.g.*, *Cox Enterps., Inc. v. News-Journal Corp.*, 469 F.Supp.2d 1094, 1108 (M.D.Fla. 2006). To account for marketability, courts apply discounts where appropriate. *See id.*; *see also Jamil v. SPI Energy Co., Ltd.*, 713 F.App'x 42, 43-44 (2d Cir. 2017); *Kleinman v. Wright*, 2021 WL 5447110, at *2 (S.D.Fla. Nov. 22, 2021); *Aldar Tobacco Grp., LLC v. American Cigarette Co.*, 2010 WL 11549584, at *1 (S.D.Fla. Mar. 4, 2010). ***The one arguing for the discount*** has the burden to establish it. *Cox*, 469 F.Supp.2d at 1108; *see also Jamil*, 713 F.App'x at 43-44; *Kleinman*, 2021 WL 5447110, at *2; *Aldar*, 2010 WL 11549584, at *1.

Pfeiffer used the "cost approach" to opine that the Title Plant's value was $30,000,000. [ECF3-342:149:18-21,158:5-9.] Pfeiffer considered the Title Plant's prior valuations, considered the individual Title Plant components, and adjusted for depreciation and inflation. [ECF3-342:149:18-158:9.]

ORT conceded the Title Plant is valuable. It stipulated that ATFS' Title Plant book value is $10,700,000. [ECF3-342:28:6-18.] While ORT disputed that book

36

value and market value are equivalent [ECF3-342:37:21-23], Gary Horn from ORT testified the Title Plant was necessary for ATFS to conduct its business [ECF3-340:83:24-84:1; ECF3-342:60:2-4]. ATFS' CFO agreed that "the Title Plant is important because that's what the underwriters use to write title." [ECF3-344:135:2-4.] She added that ATFS spends $10,000,000 each year to maintain the Title Plant because it serves a good business purpose. [ECF3-344:127:25-128:5,135:15-17.]

ORT's argument is not that the Title Plant has no value – no company would spend $10,000,000 annually to maintain a valueless asset – but rather that the Title Plant had no value *to Debtor* because any right Debtor had was contingent on certain events unlikely to occur. [ECF3-340:21:7-26:17.] In other words, ORT argued any value ascribed to the Title Plant was subject to discounts. But ORT submitted no evidence regarding a discount or what that discount should be. [*See generally* ECF3-340-ECF3-345.]

The bankruptcy court held that Appellant "presented no evidence on the value of Debtor's contingent interest in the Title Plant" or "how the value of the Title Plant should be discounted to account for the contingent nature of Debtor's interest." [ECF3-349:28.] This decision placed the burden on Appellant when it instead belonged to **ORT** to establish any discount "for the contingent nature of Debtor's interest" or for "ORT's right to a copy of the Title Plant." *See Cox*, 469 F.Supp.2d at 1108; *see also Jamil*, 713 F.App'x at 43-44; *Kleinman*, 2021 WL 5447110, at *2;

*Aldar*, 2010 WL 11549584, at *1.

Appellees argued that, despite pushing for the discount, the burden was on Appellant to establish "Debtor's right to the Title Plant, which was contingent." [ECF57:36-38; ECF64:27]. But that argument conflates rights in the Title Plant with the value ascribed to them. Debtor ***had rights in the Title Plant***; the REV Trial, Phase 1 [ECF3-278:5:17-6:1] found those rights existed: "Debtor had rights or an interest in the Title Plant that the Debtor transferred to ORT under the 2015 Master Agreement" [ECF3-341:84:17-20].[10] The issue was therefore ***what is the value***. The party seeking to employ a discount must prove it. *See Cox*, 469 F.Supp.2d at 1108; *see also Jamil*, 713 F.App'x at 43-44; *Kleinman*, 2021 WL 5447110, at *2; *Aldar*, 2010 WL 11549584, at *1.[11]

The burden to establish the discount for the contingency was on ORT – not

---

[10] The district court held that Debtor did not have a right to the entire value of the Title Plant because Appellant stipulated that "[a]fter July 1, 2009, Debtor never maintained or updated any copy of the Title Plant." [ECF64:27-28.] But the record established (through the Amended JVA and Amended and Restated Operating Agreement) that Debtor's rights included a contingency in which it received a fully updated Title Plant. [ECF3-341:82-84.]

[11] The district court cited *In re Chase & Sanborn Corp.*, 904 F.2d 588 (11th Cir. 1990), and *In re White*, 559 B.R. 787 (Bankr. N.D.Ga. 2016), reasoning the burden was on Appellant to establish the contingent value. But those cases recognize that the contingent value is the value pertinent to a reasonably equivalent value analysis. Neither case discusses which party has the burden to establish the value for the contingency, nor do they distinguish *Cox*, *Jamil*, *Kleinman*, and *Aldar*, which places the burden on the party seeking the discount.

Appellant. The bankruptcy should have valued the Title Plant anywhere from $10,700,000 (the book value stipulated by Appellees) to $30,000,000 (the value Pfeiffer ascribed). Either way, the value is more than $0, which is the amount the bankruptcy court ascribed.

Because the bankruptcy court placed the burden to establish the discount on the wrong party, its decision about the Title Plant value – and thus the REV Order itself – "cannot stand." *Abbott*, 138 S. Ct. at 2326.

### D. Denying Appellant's Rule 15(b) Motion Was an Abuse of Discretion.

On REV Trial Day 3, Appellant filed the 15(b)[12] Motion to formally allege a mediate fraudulent transfer from Debtor to the Trust in 2011. [ECF3-316.] The bankruptcy court denied the motion as futile on December 2, 2021. [ECF3-356.] That decision was wrong.

First, the bankruptcy court reasoned, and the district court agreed, that the FDIC's extender statute, 12 U.S.C. §1821(d)(14), which grants the FDIC a 6-year statute of limitations, does not apply to claims that arise after the FDIC's appointment. [ECF3-356:8-10; ECF64:54-55 (citing *Resol. Tr. Corp. v. Artley*, 28 F.3d 1099, 1101 (11th Cir. 1994)).] But this limitation is nowhere in the statute. To the contrary, the statute of limitations begins to run on "the ***later of*** – (i) the date of

---

[12] Federal Rule of Civil Procedure 15 is applicable to this Adversary Proceeding under Federal Rule of Bankruptcy Procedure 7015.

the appointment of the Corporation as conservator or receiver; or (ii) the date on which the cause of action accrues." 12 U.S.C. §1821(d)(14)(B) (emphasis added). Under the statute's plain language, the claim can accrue after the FDIC's appointment. *Id.*; *see also F.D.I.C. v. Cameron*, 986 F.Supp.2d 1337, 1344 (N.D.Ga. 2013).

The only case the bankruptcy court cited to support its reasoning for the distinction between a claim before the FDIC takes over and after is *Beckley Capital Limited Partnership v. DiGeronimo*, 184 F.3d 52, 57-58 (1st Cir. 1999). That case is inapposite because it involved an assignment of claims from the FDIC to another party. Here, there was no assignment. Rather, Appellant stepped into the FDIC's shoes under his strong-arm powers and brought claims on its behalf. *See In re Kipnis*, 555 B.R. 877, 881-83 (Bankr. S.D.Fla. 2016) (recognizing trustee can step into the shoes of IRS creditor to invoke longer statute of limitations). The district court's reliance on *Artley* [ECF64:54-55] is similarly misplaced. *Artley* stands for the proposition that if the state statute of limitations on the state law claim had expired, the FDIC may not apply the longer period to **resuscitate** the claim. *See generally* 28 F.3d 1099 (11th Cir. 1994). It says nothing about the timing of the FDIC's appointment vis-à-vis accrual of the claim. Here, the mediate transfer had not yet occurred at the time of the FDIC's appointment, so the claim had not accrued or expired. [ECF64:54-55.] If the claim had not expired, there was nothing for the FDIC

to "resuscitate"; *Artley* is inapplicable. The plain language of the statute permits the FDIC to use the longer statute of limitations.

Second, the bankruptcy court held the amendment futile because there was no fraudulent transfer. [ECF3-356:10-11.] This holding is circular. The bankruptcy court granted ORT summary judgment because it found reasonably equivalent value. The REV Order, meanwhile, turns in part on the bankruptcy court's holding that the IP had no value, either because Debtor had no right to it or because Appellant failed to prove what discount should apply. [ECF3-349:29-30.] But during the REV Trial, the bankruptcy court refused to accept all the evidence on the mediate transfer issue, instead deferring it to sometime "down the road." [ECF3-342:99:7-103:11.] And as discussed above, the burden to prove a discount was on ORT – not Appellant. *See* Part I.C, *supra*. The bankruptcy court cannot, on the one hand, find reasonably equivalent value existed where it deferred a key factual issue on an entire asset class, and then find that issue is futile because it found reasonably equivalent value was exchanged.

Appellant's mediate transfer claim is therefore neither untimely nor futile. The bankruptcy court misapplied the law and abused its discretion. *See Torres v. First Transit, Inc.*, 979 F.3d 876, 881 (11th Cir. 2020); *Sorrels*, 796 F.3d at 1281.

### E. It Was Error to Grant Appellees' Summary Judgment Motion on the Fraudulent Transfer Claim.

Rule 56[13] requires a court to enter summary judgment when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Where there are cross-motions for summary judgment, the court must evaluate each motion on its own. *PI Telecom Infrastructure, LLC v. City of Jacksonville, FL*, 104 F.Supp.3d 1321, 1336 (M.D.Fla. 2015). The court must draw all reasonable inferences against the movant. *Eckhardt v. United States*, 463 F.App'x 852, 855 (11th Cir. 2012). The court's inquiry turns on whether the facts show a sufficient disagreement for trial, or they are so one-sided that one party must prevail. *Id.*

Appellant alleged that transferring Debtor's assets to ORT **was actual fraud** under federal and Florida law. [ECF3-13:16-18,23-25.] To establish a fraudulent transfer under either law, a creditor must establish "(1) a defrauded creditor, (2) a debtor who intended fraud, and (3) a conveyance of property which is applicable by law to the payment of the debt due." *Wiand v. Wells Fargo Bank, N.A.*, 86 F.Supp.3d 1316, 11325 (M.D.Fla. 2015). The bankruptcy court denied Appellant's motion and granted ORT's motion because it found Appellant failed to meet its burden to prove fraudulent intent. [ECF3-355:41-42; ECF64.]

---

[13] Rule 56 is applicable to this Adversary Proceeding under Federal Rule of Bankruptcy Procedure 7056.

1. **Fraudulent Intent Exists.**

"Actual fraud . . . is seldom proven by direct evidence. Instead, it is usually gleamed [sic] from inferences drawn from a course of conduct." *In re McCarn's Allstate Finance, Inc.*, 326 B.R. 843, 849 (Bankr. M.D.Fla. 2005); *see also Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1271-72 (11th Cir. 1998). These inferences comprise eleven "badges of fraud." *In re Levine*, 134 F.3d 1046, 1053 (11th Cir. 1998) (listing the badges); Fla. Stat. §726.105(2). Courts have found fraudulent intent with only 2 or 3 badges present. *See, e.g.*, *In re XYZ Options*, 154 F.3d at 1271 n.17; *In re Sherman*, 67 F.3d 1348, 1357 (8th Cir. 1995); *SEC v. Elliott*, 953 F.2d 1560, 1567-68 (11th Cir. 1992); *In re Jennings*, 332 B.R. 465, 472 n.7 (Bankr. M.D.Fla. 2005); *In re Toy King Distribs., Inc.*, 256 B.R. 1, 139 (Bankr. M.D.Fla. 2000). This Court has instructed to "take into account 'the particular facts surrounding the conveyance' and avoid determining in a vacuum the presence or absence of a debtor's actual intent to hinder or delay a creditor." *General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1498-99 (11th Cir. 1997).

The bankruptcy court first addressed the badges when it ruled ORT must produce privileged communications and documents between Appellees and their counsel, Carlton Fields, under the crime-fraud exception. [ECF3-12:16.] The bankruptcy court found Appellant established fraudulent intent. [ECF3-12:12-15.] In other words, Appellant satisfied his initial burden. The burden then shifted to ORT

to disprove fraud. In its summary judgment order, the bankruptcy court reversed course and ruled Appellant failed to meet his burden, *i.e.*, failed to make a *prima facie* case. These two rulings are irreconcilable.[14]

Even without this conflict, the bankruptcy court erred in denying Appellant partial summary judgment and granting ORT final summary judgment. The bankruptcy court decided 3 badges existed: (1) the Master Agreement transferred substantially all Debtor's assets; (2) Debtor had been sued or threatened with suit before the Master Agreement; and (3) Debtor was insolvent or became insolvent due to the Master Agreement. [ECF3-355:41.] This Circuit has determined those facts are enough to find fraudulent intent – or at least, to defeat ORT's summary judgment motion. *See Elliott*, 953 F.2d at 1567-68; *In re Jennings*, 332 B.R. at 472 n.7; *In re Toy King Distribs., Inc.*, 256 B.R. at 139.

The bankruptcy court also erred when it decided 3 other badges were not present: (1) concealment; (2) insider status; and (3) reasonably equivalent value.[15] [ECF3-355:41.] Appellant will address each one in turn.

a.    The Master Agreement Was Concealed.

Under its crime-fraud ruling, the bankruptcy court found Appellant satisfied

---

[14] Appellant raised this issue before the district court, but the district court did not address it. [ECF16:99,83; *see generally* ECF64.]

[15] The bankruptcy court also found that the "Debtor incurred a substantial debt" badge was not present. [ECF3-355:41.] Appellant does not challenge that finding.

the concealment badge. [ECF3-12:14-15.] Nothing in the summary judgment order explains how Appellant established concealment in the crime-fraud order but failed to meet his burden come summary judgment. It is baffling how Appellant met the standard before but not for the summary judgment ruling because both decisions involved at a minimum the identical evidence. But further baffling is that for the summary judgment motion, Appellant supplemented the record with more undisputed facts.

Even if the bankruptcy court had not found concealment in the crime-fraud ruling, Debtor and ORT concealed the transfers. Black's Law Dictionary (11th ed. 2019) defines concealment as "the act of preventing disclosure or refraining from disclosure." The Restatement (Second) of Contracts §160 cmt. a (1979) defines concealment as "an affirmative act intended or known to be likely to keep another from learning of a fact of which he would otherwise have learned." Under either definition, the undisputed facts show Appellees and Debtor worked together to conceal the Master Agreement details from creditors.

First, Conner (ORT's then-associate general counsel) and Simmons (Debtor's then-president) submitted the Master Agreement to OIR under a trade secret designation to "avoid OIR having to provide copies to anyone inquiring." [ECF3-10:83¶254.] But the Master Agreement does not constitute trade secret under Florida law. *See* Fla. Stat. §688.001(4). There is no evidence in the record that Debtor

derived economic value by keeping the Master Agreement's terms hidden. ORT also kept other relevant information from OIR; it did not disclose information about the Title Plant or IP it received. [ECF3-146:144-46¶180.] OIR relied on ORT's incomplete representations rather than getting the undisclosed information. [ECF26:128.]

Second, after executing the Master Agreement, the parties continued to keep its terms hidden. Debtor, ORH, and ORT separately agreed that they "shall, and shall cause each of their affiliates and representatives to, hold in strict confidence and not divulge or disclose any information of any kind concerning this [Master Agreement]" and shall not "identify the terms of [the Master Agreement] (including, without limitation, the Attachments)." [ECF3-10:82¶¶251-52.] Even for the parties' employees, the Master Agreement's terms remained secret. ATFS only told its employees that ORT was reinsuring Debtor's policy claims. [ECF3-146:189-90¶¶224-25.] This could have been accomplished with a reinsurance agreement – common in the industry – and not through transferring all Debtor's assets.

The bankruptcy court disregarded the undisputed facts, holding instead that there is no "record evidence that Debtor participated in common methods of concealing a transfer such as using secret bank accounts or secret entities, deliberately falsifying financial statements, or failing to report the transfer to appropriate taxing authorities." [ECF3-355:30.] But Appellant presented evidence

that the financial information provided to OIR was different than ORT's internal financial analysis. [*Compare* ECF47:144 *with* ECF3-324:2.]

Even if there were no evidence of common methods of concealment, there is no requirement that the concealment be a "common method." No case cited by the bankruptcy court[16] states or implies that requirement. The cases instead show the different ways concealment may occur; those examples are not exclusive. An affirmative act by Debtor that either prevented disclosure, or would likely keep another from learning about, the Master Agreement *is* a concealment. *See* BLACK'S LAW DICTIONARY; Restatement (Second) of Contracts §160 cmt. a.

The district court affirmed because "[a] transfer that took place pursuant to an agreement that was disclosed to a government agency, particularly when the deed for real property included in the transfers was recorded in public records, is not a concealed transfer." [ECF64:36.] The district court cites no support for its assertion that disclosing to a government agency is sufficient to defeat the concealment prong. But even if it were, as noted above, the Master Agreement was not publicly disclosed to OIR – but rather improperly designated as a trade secret precisely to **prevent** public disclosure. [ECF3-10:83¶254.] And in any event, key details regarding the

---

[16] *In re Jie Xiao*, 608 B.R 126 (Bankr. D.Conn. 2019); *In re Bayou Group, LLC*, 362 B.R. 624 (Bankr. S.D.N.Y. 2007); *In re Sigma-Tech Sales, Inc.*, 570 B.R. 408 (Bankr. S.D.Fla. 2017).

Master Agreement's terms were still withheld from OIR. [ECF3-146:144-46¶180; ECF26:128.]

Additionally, that the deeds transferring the real property were recorded in the public records misses the point. First, the cases cited by the district court are not on-point. In both cases, the property transferred and recorded was the subject of the alleged fraud. *See In re Bal Harbour Quarzo, LLC*, 623 B.R. 903, 917 (Bankr. S.D.Fla. 2020); *see generally In re Davis*, 138. B.R. 106 (Bankr. M.D.Fla. 1992). By contrast, the alleged fraudulent transfer was not the tangible assets, which include the real property. Rather, the fraud came from including in the Master Agreement the intangible assets, including the Title Plant. If only the tangible assets had been transferred, there likely would be no case, because the tangible assets roughly equaled the liabilities ORT assumed. Second, nothing in the deed explains why Debtor transferred the intangible assets or otherwise addresses the Master Agreement and its terms. Nothing in these recordings put creditors on notice there was a fraudulent transfer. *SE Prop. Holdings, LLC v. Judkins*, 2020 WL 4280943, at *4 (11th Cir. July 27, 2020) (allowing the recording of a document to defeat a fraudulent transfer claim would "kneecap fraudulent transfer statutes").

The undisputed facts show Debtor and ORT attempted to prevent the public and creditors from learning about the Master Agreement's terms. That undisputed fact is enough to satisfy the concealment badge of fraud, and at the very least it

should create a fact question to prevent summary judgment for ORT.

b.    <u>The Master Agreement Was Between Insiders</u>.

The insider badge of fraud arises in two ways: (i) ORT could be a "statutory" insider under Florida Statute §726.102(8) and 11 U.S.C. §101(31); or (ii) the relationship could require "heavy scrutiny." *In re Florida Fund of Coral Gables, Ltd.*, 144 F.App'x 72, 75 (11th Cir. 2005). The latter applies, and thus "must be determined by a factual inquiry into the Debtor's relationship with the alleged insider." *See In re Island One, Inc.*, 2013 WL 652562, at *2 (Bankr. M.D.Fla. Feb. 22, 2013).

Courts analyze two facts to establish the "close relationship": "(1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length." *Id.* The undisputed facts satisfy both factors. After entering the JVA and forming ATFS, all Debtor's members began issuing title policies written by ORT. [ECF3-10:20,22,24¶¶58,60-61,65-66.] At the same time, Debtor's employees managed the claims against ORT policies. [ECF3-10:20,22¶¶58, 60.]

When Debtor's finances continued to decline in 2014 and 2015, Debtor sought advice from ORT. Debtor requested ORT review Debtor's finances and suggest courses of action, which ORT did. [ECF3-10:63-65¶¶192-96.] The relationship grew closer as the Master Agreement neared. In October 2015, ORT began administering

Debtor's claims. [ECF3-10:86-89¶¶265-70.]

In re Coral Gables is instructive. Insider status existed because there was a close relationship between the principal of a fund, the fund, and its directors. The principal and the fund employed the fund administrator, shared office space, and transacted most of their business in the same offices. See In re Coral Gables, 144 F.App'x at 73. The relationship between ORT and Debtor is similar. ORT and Debtor mixed their businesses through ATFS, resulting in Debtor's employees managing title policies issued by ORT. And like in In re Coral Gables, the work performed by Debtor, ORT, and ATFS occurred in the same location – Debtor's headquarter building. [ECF3-10:68¶¶208-10; ECF3-272:7¶¶58-59.]

The Master Agreement was also not an "arm's-length" transaction. ORT and ORH prepared a term sheet providing exactly what they "were willing to do," leaving Debtor no room to negotiate. [ECF3-10:53¶175.] When Conner – a former Debtor employee – presented the Master Agreement to Debtor's board of directors, he asked them to "take one for the team." [ECF3-10:50-51¶166.] Teammates are insiders. The Master Agreement came into existence because Debtor and ORT principals concocted it. While both parties hired outside counsel after the fact, communications regarding the Master Agreement occurred directly between Conner (on behalf of Appellees) and Simmons (on behalf of Debtor). [ECF3-10:52-60¶¶172,176-80.] ORT employed Debtor's prior counsel in hopes Debtor would not

retain separate attorneys. [ECF3-10:59¶¶177-78.] And when OIR received the Master Agreement for approval, Conner spoke with the Florida administrators *on Debtor's behalf*. [ECF3-10:65¶197.] None of these facts show an arm's-length transaction. *See* BLACK'S LAW DICTIONARY (11th ed. 2019) (arm's-length is "a transaction between parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises").

The bankruptcy court disregarded these facts when it concluded "the evidence shows that Debtor and ORT had a business relationship . . . but does not show that ORT gained advantages from the relationship." [ECF3-355:38.] But the record evidence belied the facts cited: separate counsel represented Debtor and ORT despite counsel being afterthoughts [*Compare* ECF3-355:37 *with* ECF3-10:52-60¶¶172,176-80 *and* ECF3-10:59¶¶177-78]; and an unrelated entity, SOBC Corp., made a separate proposal to purchase Debtor's stock, but ORT held veto power over any deal [*Compare* ECF3-355:37-38 *with* ECF3-10:43-44¶145 *and* ECF3-146:122¶156].

The bankruptcy court also decided facts in ORT's favor based on what "the record here suggests." [ECF3-355:38-39.] Deciding what the record suggests means the bankruptcy court made inferences or weighed evidence. Either way, it is wrong when ruling on Appellees' summary judgment motion. *See Eckhardt*, 463 F.App'x at 855. Deciding these issues required the factfinder evaluate evidence at trial and

51

consider live witness testimony. *See Tippens v. Celotex Corp.*, 805 F.2d 940, 952-53 (11th Cir. 1986) ("Summary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment."). The bankruptcy court did not do that.

The district court, meanwhile, affirmed the bankruptcy court and concluded Appellant was "speculating." [ECF64.] But speculation occurs when there is no factual evidence. Here, as detailed above, Appellant presented evidence of the close relationship between ORT and Debtor and that the Master Agreement was not conducted at arm's-length. Both the bankruptcy court and district court recognized that Debtor's senior management and directors may have had mixed motives. [ECF64:39.]

It is for a factfinder – not a court on summary judgment – to determine true motives.

Accordingly, the record shows Debtor and ORT were insiders. At a minimum, factual issues precluded summary judgment in ORT's favor. Either way, it was error to conclude Appellant failed to meet his burden to establish the insider badge.

   c. <u>The Master Agreement Was Not for Reasonably Equivalent Value.</u>

The bankruptcy court erred when it entered the REV Order. *See* Parts I.A.-I.C, *supra*. Finding the parties exchanged reasonably equivalent value was,

therefore, error.[17]

\*\*\*

The bankruptcy court found Appellant established 3 badges – a holding Appellees have not challenged. It was error for the bankruptcy court to find that 3 other badges – concealment, insider status, and reasonably equivalent value – were not present. The record evidence and REV Trial establish these 3 badges as well. The Master Agreement was a transaction based on fraudulent intent. Thus, the bankruptcy court should have granted summary judgment in Appellant's favor and denied summary judgment for ORT. Minimally, factual issues precluded a finding in ORT's favor, and a trial on insider status, concealment, and the parties' intent in general was necessary.

### 2. "Legitimate Purpose" Cannot Be Determined on Summary Judgment.

The bankruptcy court decided Debtor did not possess the requisite fraudulent intent because the Master Agreement had a supervening "legitimate purpose":

---

[17] Although the bankruptcy court discussed the principle that the reasonably equivalent value badge was not dispositive for actual fraud [ECF3-355:27-28], the record shows the opposite. The bankruptcy court stated that "reasonably equivalent value is really what the case comes down to" [ECF3-273:17:11-14] and the "linchpin" of Appellant's claim [ECF3-349:18]. It is hard to reconcile these statements with the bankruptcy court's statement about reasonably equivalent being one factor, given that the bankruptcy court found 3 other badges present and still granted ORT summary judgment.

enabling Debtor to reinsure its policy liabilities.[18] [ECF3-355:41.] The bankruptcy court relied on 3 cases for this proposition. [ECF3-355:39.] But every case relied on found a legitimate supervening purpose based on factual findings *after trial*. *See In re Global Outreach, S.A.*, 2014 WL 4948184, at *1 (Bankr. D.N.J. Oct. 2, 2014); *In re Porter*, 2009 WL 902662, at *2 (Bankr. D.S.D. Mar. 13, 2009); *In re Earle*, 307 B.R. 276, 282 (Bankr. S.D.Ala. 2002). By contrast, the bankruptcy court held no trial, yet still decided Debtor's intent and supposed legitimate purpose in entering into the Master Agreement. [ECF3-355:39-41.] That ruling should have come after trial. *Tippens*, 805 F.2d at 952-53.

A trial is necessary because the record contains facts calling into question whether Debtor's intent was, in fact, legitimate. Connor stated it was important to keep Debtor from receivership, and instead enter into the Master Agreement, because receivership would mean the JVA would be over, and Appellees could lose the IP. [ECF3-10:50¶165.] A Debtor's board member testified that Appellees asked Debtor to "take one for the team" [ECF3-10:50-51¶166]; do what was in Appellees' interests, not what was in Debtor's or its creditors' interest. Debtor's board also debated what was in ***their*** best interest – not Debtor's or creditors' best interest. The

---

[18] Though Appellant has found no case in which a court characterized "legitimate purpose" as an affirmative defense, in effect, that is what it is. It is a defense that turns on plaintiff establishing fraudulent intent. Given this sounds in an affirmative defense, Appellees needed to have pled it in their answer. They did not. [ECF3-15.]

board debated whether receivership (versus the Master Agreement) would subject them to personal liability and whether it would interfere with their personal business. [ECF3-10:47,50-51¶¶157,166-67,170.] If the Master Agreement was solely for legitimate purposes, these discussions would not exist.

Additional aspects in the Master Agreement also call into question its legitimacy. First, if the purpose was to obtain reinsurance, then the Master Agreement would just be a reinsurance contract and not the myriad agreements transferring various assets and leaving behind specific liabilities. [*See generally* ECF26.] Second, if Debtor was insolvent – as the bankruptcy court and OIR both found – then stringing Debtor along for Appellees' benefit could not be legitimate. Rather, the Florida Legislature has laid out a comprehensive statutory scheme detailing how troubled title insurers are to resolve their financial distress: through receivership, rehabilitation, and liquidation. *See* Fla. Stat. ch. 631. Avoiding Florida's statutory process to benefit Appellees to creditors' detriment is not legitimate.

Contrary to the district court's suggestion, Appellant's arguments are not speculative. The evidence – not speculation – calls into question whether the Master Agreement had a legitimate purpose. The bankruptcy court, at a minimum, had to evaluate evidence and testimony to make factual findings about Debtor's intent and purpose to decide that, despite the actual fraud, the transfer was legitimate. Skipping

trial, therefore, requires reversal.

## II.     Disputed Material Facts Precluded Summary Judgment to ATFS on Successor Liability.

Rule 56 requires a court to enter summary judgment only when "there is no genuine issue as to any material fact" such that the movant is "entitled to a judgment as a matter of law." A summary judgment motion turns on whether the facts show a sufficient disagreement for trial. *Eckhardt*, 463 F.App'x at 855.

Regardless what theory is at issue,[19] the central factor in a successor liability case is "whether one company has become another for the purpose of eliminating its corporate debt." *See In re Comprehensive Power, Inc.*, 578 B.R. 14, 35 n.14 (Bankr. D.Mass 2017). Under a *de facto* merger theory, the inquiry is whether "one entity is absorbed by another without formal compliance with the statutory requirements for a merger" resulting in a change in corporate identity form, but not in substance. *Murphy v. Blackjet, Inc.*, 2016 WL 3017224, at *5 (S.D.Fla. May 26, 2016). The inquiry is similar under the mere continuation theory, where the "bottom-line question is whether each entity has run its own race, or whether[] there has been a relay-style passing of the baton from one to the other." *Centimark Corp. v. A to Z Coatings & Sons, Inc.*, 288 F.App'x 610, 614 (11th Cir. 2008). The claims raise fact questions viewing the totality of circumstances. While certain factors guide the

---

[19] The bankruptcy court decided "de facto merger" and "mere continuation" theories were "distinction without a difference." [ECF3-355:44n.174.]

analysis, the "finder of fact may look at any factors reasonably indicative of commonality or of distinctiveness." *Laboratory Corp. of Am. v. Professional Recovery Network*, 813 So.2d 266, 270 (Fla. 5th DCA 2002); *see also Centimark*, 288 F.App'x at 615-16. No one factor or combination is determinative.

In granting ATFS' summary judgment motion, the decision failed to view the relationship between Debtor and ATFS as a whole. Rather, the bankruptcy court identified six factors and analyzed each one in a vacuum. [ECF3-355:44-51.] It then concluded that, because Debtor only satisfied one factor, Appellant failed to meet his burden. [ECF3-355:51-52.] This piecemeal analysis does not answer the true question in a successor liability case – whether Debtor and ATFS ran their own races or are really just a newly painted façade.

One relevant undisputed fact – ATFS branded as "The Fund" so "to the public it would look like The Fund was still around, even though it was really the joint venture behind it, not ATIF"[20] – played no role in the analyses. [ECF3-355:44-51.] Another fact not properly considered was that ATFS' corporate headquarters were the same as Debtor's.[21] [ECF3-10:68¶¶209-10.] The failure to consider these

---

[20] [ECF3-10:38-39¶¶127-28; ECF3-146:4-5¶¶8-9; ECF3-272:7¶56.]

[21] The district court stated the bankruptcy court "noted that 'Debtor leased its Headquarter[s] Property to ATF Services to use as its principal place of business'" and thus "ATFS and Debtor operated from the same location." [ECF64:45.] However, this was stated in passing and neither court analyzed the import of the shared location in determining whether ATFS "ran its own race." [ECF64:43-48;

undisputed facts in a totality-of-the-circumstances approach was error.

But even if the bankruptcy court had explored the factor in the totality, it was still error to grant ATFS summary judgment. The parties raised material factual disputes for the factors specified by the bankruptcy court.[22]

### A.    Did Debtor and ATFS Have Sufficient Overlapping Assets?

There is no requirement under Florida law that a successor have the same assets as the predecessor. *See Murphy*, 2016 WL 3017224, at *5.[23] The bankruptcy court cited no case mandating equivalent assets. There is also a material factual dispute over the assets transferred. The record establishes Debtor gave ATFS a copy of the Title Plant, use of Debtor's IP, furniture and equipment, and all its workforce. [ECF3-27:3¶13; ECF3-272:6¶¶38-39,56; ECF3-274:7¶142.] Without these assets, ATFS could not have performed its function. [ECF3-146:71¶101.] ATFS argued that Debtor retained more than $240 million in assets based on its statutory balance sheet. [ECF3-23:17.] Appellant disputed this alleged fact based on Debtor's quarterly statement and understanding how title insurers must report finances. [ECF3-146:56¶82.[24]] It is for trial – not summary judgment – to weigh the competing

ECF3-349:44-51.]

[22] There was no dispute that Debtor and ATFS had the same management and personnel. [ECF3-272:6¶¶ 38-39.]

[23] The bankruptcy court's attempt to distinguish *Murphy* misapplied the case.

[24] The district court stated that Appellant did not dispute this fact and instead "disputes the characterization as misleading." [ECF64:45.] This is a distinction

58

evidence and decide whether Debtor "retained substantial assets" and whether Debtor and ATFS had "the same assets."

## B.     Did ATFS Continue Debtor's Business Operations?

Before the JVA, Debtor's business entailed selling title insurance, claims processing, education, support services for agents, and litigation. [ECF3-10:21-22¶59.] Following the JVA, ATFS performed all the same roles except selling title insurance. [ECF3-10:21-22¶59; ECF3-146:52-53¶77; ECF3-272:7¶¶54-55.] That means for 5+ years, Debtor did not sell title insurance. Rather than reserve this decision for trial, the bankruptcy court decided "Debtor's core business was that of a licensed title insurer." [ECF3-355:47.] It was error to make this factual finding on summary judgment. *See Simmons v. Southern Power & Equipment, LLC*, 2007 WL 9701638, at *8-*9 (N.D.Ga. Jan. 4, 2007).

## C.     Did Debtor and ATFS Have Common Ownership?

The bankruptcy court recognized that common – not identical – ownership is necessary to find successor liability. *See Murphy*, 2016 WL 3017224, at *4-*5. The record establishes a common ownership between Debtor and ATFS. The Trust owned Debtor. [ECF3-272:3¶8.] When ATFS was formed in 2009, the Trust, through Debtor, owned 50%. [ECF3-10:22,40¶¶60,129.] After the Master

---

without a difference. Regardless how Appellant characterized it, Appellant did not agree or admit Debtor had $240 million in assets.

Agreement, the Trust cut out Debtor and directly owned the ATFS Class B shares. [ECF3-272:11¶¶104-06.] Thus, the Trust had an ownership interest in Debtor and ATFS.

Both the bankruptcy court and the district court dismissed this overlapping ownership. But again, that decided facts not law. Most cases the bankruptcy court relied on[25] involved a ***trial or evidentiary hearing***.[26] *See In re All Sorts of Services of America, Inc.*, 631 B.R. 63, 77 (Bankr. M.D.Fla. 2021); *ADT LLC v. Security Networks, LLC*, 2016 WL 8943163, at *1 (S.D.Fla. June 8, 2016); *Global One Financial, Inc v. Intermed Services, P.A.*, 2015 WL 1737710, at *1 (S.D.Fla. Apr. 16, 2015). Like in those cases, deciding whether the Trust's interest in Debtor and ATFS was sufficient to impose successor liability is something for trial, not summary judgment.

### D. Did Debtor Dissolve?

The record established that Debtor has ceased all operations and is in the process of dissolving through the bankruptcy case. *See* No. 9:17-bk-01712-FMD, Dkt. No. 273, at §7.3.3. That it did not immediately dissolve is immaterial. *Coral*

---

[25] The district court cited no cases to support its conclusion that governance-only ownership is insufficient to establish common ownership. [ECF64:45-46.]

[26] The one case decided on summary judgment found that there ***was*** successor liability under a mere continuation theory. *Amjad Munim, M.D., P.A. v. Azar*, 648 So.2d 145, 154 (Fla. 4th DCA 1994).

*Windows Bahamas, LTD. v. Pande Pane*, 2013 WL 321584, at *4 (S.D.Fla. Jan. 28, 2013) ("All of the events, such as dissolution, need not occur at the same time.").[27] A factfinder could conclude that, for all intents and purposes, Debtor dissolved.

### E. Did ATFS Assume Debtor's Liabilities?

The record established that ATFS assumed Debtor's liabilities by assuming real property leases for Debtor's branch offices, which it used for its business operations. [ECF3-146:102-03¶134.] The bankruptcy and district courts concluded this was an insufficient liability. [ECF3-355:50-51.] But whether assuming those leases is enough to create successor liability is a fact question that required a trial – not to decide on summary judgment. *See Coral Windows*, 2013 WL 321584, at *4.

\*\*\*

The bankruptcy court did not evaluate the totality of the circumstances, choosing to ignore certain undisputed facts that did not fit into selected categories. And for those categories, rather than evaluate whether factual disputes were material, the bankruptcy court weighed the evidence as if it were at trial. The Court should reverse and remand for a trial on successor liability.

### III. Summary Judgment on Alter-Ego Is Legally and Factually Flawed.

In the alter-ego context, Florida law requires the plaintiff prove

---

[27] The district court appears to have overlooked Appellant's citation to *Coral Windows* in its analysis, incorrectly stating that Appellant "cites no authority that suggests a company 'in the process of dissolving' has dissolved." [ECF64:47.]

(1) shareholder domination/control such that there is no independent corporate existence; (2) fraudulent or improper use of the corporate form; and (3) injury stemming from the improper use. *Zurich American Ins. Co. v. Hardin*, 2020 WL 3272636, at *2 (M.D.Fla. Mar. 11, 2020). Summary judgment for alter-ego cases is often not appropriate because the factfinder must determine credibility or decide factual inferences. *See id.* at *1; *In re Pearlman*, 2013 WL 6153869, at *2 (Bankr. M.D.Fla. Nov. 22, 2013). The bankruptcy court recognized factual issues precluded deciding the "dominated and controlled" factor. [ECF3-355:53-61.]

## A. The "Improper Use" Factor Did Not Support Summary Judgment.

The bankruptcy court held that ORH, ORC, and ATFS were entitled to summary judgment on the "improper use" factor because no one formed ATFS for an illegitimate purpose. [ECF3-355:62-64.] Alter-ego law does not erase subsequent events leading to alter-ego just because a company was initially legitimate. *In re Fundamental Long Term Care, Inc.* – cited in the bankruptcy court's summary judgment order – stands for the unremarkable proposition that for an alter-ego claim to be viable, there must be "creation *or use* of the corporate form for an improper purpose." 507 B.R. 359, 374 (Bankr. M.D.Fla. 2014) (emphasis added).[28] The *In re Fundamental* court recognized that, even if the corporation had been legitimate,

---

[28] *In re Fundamental* did not address alter-ego under the summary judgment standard because that court was addressing a motion to dismiss. 507 B.R. at 385-86.

subsequent improper usage could still result in an alter-ego finding. *Id.*; *see Zurich*, 2020 WL 3272636, at \*2. Pinning the decision on when the founding parties formed ATFS to decide whether they used the corporate form for improper purposes is reason enough for reversal.

But granting summary judgment was also error because material factual disputes exist. First, Appellant proved that Appellees had a single joint account and comingled funds in that account. [ECF3-157:78:23-80:8.] The bankruptcy court determined that this alone is insufficient because there was "no evidence to show that the joint account was actually *used* to divert funds." [ECF3-355:63 (emphasis in original).] This finding ignored the bankruptcy court allowing Appellees to withhold bank statements and wire information for Appellant and his expert to analyze. [ECF3-120; ECF3-126; ECF3-207:40:22-41:13.] While Appellees provided some limited banking information at the bankruptcy court's insistence,[29] it was incomplete. [Bankr.ECF302-4:100:17-101:9.] Summary judgment here rewarded ORH's, ORC's, and ATFS' obstruction.

Second, the record evidence established ATFS did not observe all corporate formalities. [ECF3-355:62-63.] ATFS failed to calculate its service fee, failed to

---

[29] Appellant moved the bankruptcy court for sanctions because Appellees refused to produce banking information and decided instead to create a summary spreadsheet after-the-fact to produce in discovery. [ECF3-120.] The bankruptcy court denied the motion and converted it into a motion to compel. [ECF3-144]

keep proper cash receipts and disbursement records, and failed to keep accurate tax returns. [ECF3-146:71-72,200¶¶102,249.] Despite ATFS being financially co-owned by Debtor and ORH until 2011, in 2010, ATFS' tax returns reported ORH holding all ATFS' profit. [ECF3-146:72-73¶102.] ATFS also did not prepare year-end earnings statements and balance sheets for 2017 and 2018. [ECF3-129:3-4.] These actions demonstrate Appellees neither observed corporate formalities nor acted as a legitimate business would.

Third, the record contains evidence that ATFS was a shell for ORH and ORC (and, to an extent, ORT). ATFS had no employees – ORT employees performed all ATFS' work. [ECF3-10:96-97¶¶289-90; ECF3-272:11¶109.] The ATFS lease arrangement lacked any economic substance: "ATFS pays rent to Old Republic Title for offices for Old Republic Title's employees to do services in ATFS' area of responsibility" and "Old Republic Title reimburses ATFS for that rent expense." [ECF3-10:98¶¶293-94.] And its "revenue" included (i) service fees capped at the lesser of its expenses or 15% and (ii) services provided to third parties capped at $2,000,000 (the rest going to ORH). [ECF3-146:68-70¶97.] These restrictions showed ATFS could not be profitable or maintain itself.

A trial would have enabled the bankruptcy court to evaluate witness credibility when subjected to cross-examination to determine that ATFS became a shell for ORH and ORC to abuse and use improperly. *See In re Bull*, 528 B.R. 473,

487 (M.D.Fla. 2015); *Lipsig v. Ramlawi*, 760 So.2d 170, 187 (Fla. 3d DCA 2000).

Taking these standards into account and construing inferences against the movants should have resulting in denying summary judgment. Granting the motion was therefore error.

### B.    Record Evidence Creates a Material Fact Disputes About Whether Creditors Suffered Harmed by ATFS' Corporate Form.

The bankruptcy court held there was "no evidence that any of Debtor's creditors were misled or injured because they did not know of the relationship between ATFS and ORH, ORT, or ORC" because creditor claims arose before forming ATFS.[30] [ECF3-355:64-65.] But Debtor's creditors suffered harm because ATFS is liable to creditors on successor liability grounds caused when ORH and ORC gutted it to leave nothing for Debtor's creditors. [ECF3-13; ECF3-205:15-16.] It therefore makes no difference that creditors' claims arose before ATFS formed. To the contrary, that is the whole point.

The bankruptcy court also erred when it reasoned there was no evidence that the conduct misled or injured creditors because creditors did not know about the relationship between ATFS, ORH, and ORC. Appellant has not found any authority for imposing the knowledge requirement. The claim requires showing creditors suffered harm by the improper use. *See Zurich*, 2020 WL 3272636, at *2; *In re*

---

[30] The district court did not analyze this prong. [ECF64:50.]

*Fundamental*, 507 B.R. at 373. They did.

But even if there were a requirement for creditors to know about the relationship between entities, there exists record evidence that Appellees misled creditors about the relationship. Creditors believed Debtor had a 50% ownership interest in ATFS, even though after the 2011 JVA, Debtor had no financial interest in ATFS. [ECF3-10:40¶132.] And Appellees intended to blur the lines over ATFS' members. Conner explained he "played a little looser with the members of the joint venture." [ECF3-137:2.]

There is sufficient evidence demonstrating a triable issue. There is a triable issue about ATFS' liability to Debtor's creditors under successor liability. *See* Part II, *supra*. And ORH's and ORC's improper use of ATFS deprived creditors any relief. First, ORH manipulated ATFS' revenues to ensure it would not be profitable. [ECF3-146:68-70¶97.] Second, the parties revised the ATFS Operating Agreement for Debtor to surrender its right to convert the Class B units into Class A units (for no consideration), ensuring Debtor could not attain a financial interest in ATFS. [ECF3-10:71¶221.] Third, to further isolate Debtor, ORH called Debtor's Class B units in ATFS and gave them to the Trust. [ECF3-272:11¶¶104-05.] ORH and ORC gutted any value from ATFS, guaranteeing Debtor could not regain its equal interest in ATFS. The scheme ensured creditors could not recover from ATFS. Taking all inferences in Appellant's favor, a trial would decide whether Debtor's creditors

suffered injuries from ORH and ORC using ATFS improperly. *See Lipsig*, 760 So.2d at 187. Factual issues precluded judgment on the "injury" prong.

***

The lower courts overlooked or weighed relevant evidence without a trial. These errors mandate reversal.

### CONCLUSION

Based on the foregoing, Appellant respectfully requests the Court enter an order:

1. Reversing final judgment in Appellees' favor;

2. Remanding to the bankruptcy court for a new trial on all claims, including reasonably equivalent value;

  and

3. Granting further relief the Court deems just and proper.

Dated: June 20, 2023

Respectfully submitted,

BECKER & POLIAKOFF, P.A.
*Attorneys for Daniel J. Stermer, as Creditor Trustee*
1 East Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301
Telephone: (954) 987-7550
Facsimile: (954) 985-4176
JPolenberg@beckerlawyers.com
DGoldman@beckerlawyers.com
TFritz@beckerlawyers.com

By: */s/ Jon Polenberg*

Jon Polenberg, Esq.
Florida Bar No. 653306
Darren Goldman, Esq.
Florida Bar No. 88638

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

I certify that this document complies with this Court's June 12, 2023 Order [ECF26] because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 14,871 words.

I further certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14 point font Times New Roman.

By: */s/ Jon Polenberg*
       Jon Polenberg, Esq.
       Florida Bar Number 653306

**CERTIFICATE OF SERVICE**

I certify that on June 20, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF. I also certify that the foregoing is being served on this day on all counsel of record via the Court's CM/ECF Notice of Docket Activity.

By: */s/ Jon Polenberg*
      Jon Polenberg, Esq.
      Florida Bar Number 653306